NEW-YORK,
May, 1823.

BUSH,
v.
BRAINARD.

BUSH *against* BRAINARD—*Certiorari from a Justice's Court.*

An action will not lie for carelessly leaving maple syrup in one's unenclosed wood, whereby the plaintiff's cow, being suffered to run at large, and having strayed there, is killed in drinking it.—The reason is, the cow has no right there.—Otherwise, if she be there by the defendant's permission. One cannot recover for an injury, even from gross negligence, in the lawful use of another's property, unless he is free from culpable negligence on his part.

CASE, by *Brainard* against *Bush,* who made maple sugar in an unenclosed piece of woodland, 60 or 70 rods from one *O. B's* residence, who kept *Brainard's* cow, which, with *O. B's* cattle, ran at large in the woods, and *Bush* knew that *O. B's* cattle so ran at large. *Bush* left some buckets of syrup in his sugar works, under an unenclosed shed, to which *Brainard's* cow came in the night, and drank, which caused her death. There was no evidence of any town by-law, permitting cattle to run at large, nor any evidence of *Bush's* consent that these cattle, or cattle generally, might run upon his premises. Verdict and judgment for plaintiff.

*C. M. Lee,* for the plaintiff in error.

*J. H. Gregory,* for defendant.

SAVAGE Ch. J. *Sic utere tuo, ut non alienum lædas,* is a sound as well as an ancient maxim. But in all cases, where damages are sustained by the plaintiff, in consequence of the use which the defendant makes of his own property, it is necessary to inquire, not only whether the defendant has been guilty of culpable negligence on his part, but whether the plaintiff is free from a similar charge. In the case of *Blyth* v. *Topham,* (*Cro. Jac.* 158, 9,) the defendant digged a pit in a common, and the plaintiff's mare, *being straying there,* fell into the pit and perished. The Court held that no action lay, because the plaintiff, *shewing no right why his mare should be in the common,* the digging the pit was lawful as against him. His loss was, therefore, *damnum absque injuria.* Otherwise, had he digged the pit in the highway. (*Roll. Ab.* 88. *Co. Litt.* 56, *a.*) In *Townsend* v. *Wathen,* (9 *East,* 277,) the defendant set traps in his unenclosed wood, which was intersected by highways and paths. The plaintiff's dogs were caught in the traps and injured, for which he recovered. Ch. J. *Ellenborough* places

the defendant's liability on the fact, that the traps were set
and baited with strong-scented meats, so near the plaintiff's
yard, where his dogs were kept, that they might scent the
bait without trespassing on the plaintiff's wood. And he
asks, what difference there is, in reason, between drawing
the animal into the trap, by means of his instinct, which he
cannot resist, and putting him there by manual force? In
*Clark* v. *Foot*, (8 *John.* 421,) this Court say, " It is lawful for
a person to burn his fallow, and if his neighbour is injured
thereby, he will have a remedy, if there be sufficient ground
to impute the act to the *negligence* or *misconduct* of the de-
fendant." And in *Wells* v. *Howell*, (19 *John.* 385,) it was
decided, that the owner of an unenclosed field may maintain
trespass against the owner of a horse, grazing there, unless
the defendant shew a right to permit his cattle to go at
large. (*a*) In that case it was conceded that there was no
town regulation on the subject.

(*a*) The *nucleus*, of all the authorities in relation to this subject, is the an-
cient maxim, *that no man shall take advantage of his own wrong or negli-*
*gence*, in his prosecution or defence, against another. (12 *John.* 434.) A
kindred principle, on which this doctrine may be placed, is, that one is bound
to use any thing that is his, so as not to hurt another by such user. (6 *Mod.*
314.)

To apply these maxims, we must first inquire, how the common law
stood in the matter? and, secondly, how far, and in what respect, it has
been, or may be, departed from, by statute, agreement, or prescription?

*First.* At common law, every man was bound to keep his beasts within
his own close, under the penalty of answering, by distress or action, for all
injury arising from their being abroad. (Per *Parsons*, C. J. 6 *Mass. Rep.*
94. *F. N. B.* 128. 22 *H.* 6. 9. *Br. Trespass*, 345, 439. 16 *H.* 7. 14.
13 *Vin. Abr. Fences*, A. *Dyer*, 372, *pl.* 10. 20 *Edw.* 4. 10. 6 *Mod.* 314. And
vid. 1 *Taunt. Rep.* 529. 19 *John.* 385. 3 *Bl. Com.* 209. *Selw. N. P.*
1224.) And this, doubtless, is still the law, in relation to such animals, as
cannot be restrained by those enclosures which farmers of experience
would pronounce proper and sufficient fences.

1. The first exception to the common law, arises from statute, (*sess.* 36,
*c.* 35, *s.* 17, 2 *R. L.* 133,) relative to division or partition fences. The
neglect to build or repair, as required by that statute, renders the party lia-
ble, in damages, for injuries arising from such neglect; and this, not only by
the express declaration of the statute, but at the common law.

Under this statute, before the party can be made liable for defect of his
partition fence, the proportion which he is bound to build or repair, ought
to be either agreed upon, or assigned, pursuant to the statute. Till this, the

NEW-YORK,
May, 1823.

BUSH,
v.
BRAINARD.

In my opinion, the deduction to be drawn from these de-cisions is, that although the defendant was guilty of gross negligence, in leaving his syrup where cattle running at large in the woods might have access to it, yet, the plaintiff, hav-ing *no right* to permit his cattle to go at large there, has no right of action.

Judgment reversed.

obligation is undefined. The respective occupiers of two closes adjoining, are bound to make and maintain, each one half of the partition fence; but, unless the fence, or the line on which it is to be made, has been divided, by an agreement between the parties, or assigned, pursuant to the statute, or by prescription, neither party is obliged to maintain any part of the partition fence. (Per *Parsons*, *C. J.* 6 *Mass. Rep.* 100.) And, indeed, if there exist in such case, a joint obligation to make the fence, no legal effect would flow from it ; for then, each party would be bound, equally, to make every part, and if the fence be defective, each party would be chargeable with the deficiency ; and, upon the escape of cattle from either close to the other, through a defect in any part of the fence, the owner of the cattle could not allege the escape to be from the deficiency of the other's fence. (*Id.* 101, and vid. 19 *John.* 385.) Thus, the common law doctrine applies till the proportions are ascertained.

Wherever a dispute arises, between the parties, as to the proportion of fence to be maintained by each, it may be settled by the fence viewers, even where there has been an agreement on the subject. (4 *John. Rep.* 414-15.) and such decision may be made by parol, and proved, like any other fact, res-ting in the memory of witnesses, (*id.* 415-16 ;) and it is finally to be deter-mined by the balance of testimony. (*id.*) On being ascertained, under the stat-ute, the assignment, pursuant thereto, imposes the same duty as would result from a prescription ; and, instead of a *curia claudenda*, one tenant may, after proper notice and due time, prescribed by the same section of the statute above quoted, make and repair the fence belonging to the other, on his neg-lect, and recover the expense of him, in an action for work and labour. (9 *John.* 136,) *Section* 18 of the same statute, (2 *R. L.* 133,) provides a still more speedy remedy for rebuilding such partition fences, enclosing mead-ows or low land, as are liable to be carried away by the floods and high tides.

By statute, (*Sess.* 36, *ch.* 35, *s.* 12, 2 *R. L.* 131,) town meetings may reg-ulate *partition* and *circular* fences, and determine the times and manner of using their *common lands*, *meadows* and *other commons*, and the times, pla-ces and manner, of *permitting or preventing cattle*, &c. *to go at large*.

The subjects of this statute, are either partition or circular fences. The towns have no power to interfere with the interior regulations of a man's farm, either in keeping his cattle or building his fences. (12 *John.* 433.) They can impose no duties, to maintain fences, beyond those which tenants are bound to maintain, by common or statute law ; though they may, by statute, (2 *R. L.* 131, *s.* 12,) determine the sufficiency of those required by

CUTLER *against* CARPENTER—*Certiorari from a Justice's Court.*

CASE, in the Court below, by *Cutler* against *Carpenter*, for fraud in the sale of a horse. At the sale, the defendant represented the horse good to work, *as far as he knew*; whereas he was fickle, and the defendant had said, that the horse had troubled him *once*, in drawing hay. To shew, however, that he had not deceived the plaintiff, the defendant called a witness, who swore that, in a conversation with the plaintiff, he said that the defendant had *told him*, that he not be permitted to express his belief, as to that fact. And where such an answer was objected to, but admitted, the judgment was, for that reason, reversed.

A witness, on his examination in chief, after having sworn to a conversation, and stated that there was nothing in it, from which he could say that it alluded to a particular time, should

law to be built. (12 *John. Rep.* 433. 15 *John. R.* 220.) These circular fences are matters of local concern, and are noticed, for the first time, that I can discover, in 1 *Smith & Livingston's* edition of the laws of this state, 426, by the recital in a colonial act there, passed in 1750. It recites, that the freeholders, &c. in some cities and towns, &c. are accustomed to make *circular fences for the surrounding of their lands*, &c. by which means great quantities of their lands, &c. are surrounded by a common enclosure, securing those who do not contribute towards making it ; and then provides for compelling contribution, in a summary manner, which has, by subsequent statutes, been left to town regulation.

When our ancestors first settled in this country, they found it uncultivated ; and when closes were made by the settlement and cultivation of the lands, there could be no prescription to fence ; and, therefore, the common law, authorising the writ of *curia claudenda*, being inapplicable to the state of the colony, was never introduced. (Vid. 6 *Mass. Rep.* 94, 5.) Provisions respecting fences were early made by the legislature of the colony of *New-York*, which have been continued since the revolution, nearly in their colonial shape. These statutes are the foundation of all the obligations imposed on the citizens by law, to make and repair fences. (*Id.* 95. Vid. 1 *Laws N. Y.* by *Smith & Livingston*, 426, 427. Do. by *Van Schaick*, 3, 289-90. 2 do. by *Jones & Varick*, 337, 8, 9. 2 do. by *Greenleaf*, 170, 2, 3. 1 do. by *Kent & Radcliff*, 331, 2, 3. 2 do. by *Woodworth & Van Ness*, 131, 3, 4.) Their great object is to establish the rights and obligations of tenants of adjoining closes, respecting the making and maintaining partition fences. These, where their proportion of the partition fence is assigned to them, or to those under whom they claim, by the fence

NEW YORK,
May, 1823.

CUTLER
v.
CARPENTER.

had had one scrape with the horse ; but there was *nothing in the conversation from which he could say that the plaintiff alluded to the time of the sale, as the period when the defendant had given him this information.* He was then asked by the defendant's counsel, what his *belief* was as to that fact ? This question was objected to by the plaintiff's counsel, but the objection was overruled. He then answered that *he took it, that the time of sale was meant.* Verdict and judgment for the defendant.

T. *Lawyer,* for the plaintiff in error.

E. *Holliday,* for defendant.

viewers, pursuant to the statute, have no right to a distress, or action, for any injury arising from the absence or defect of the fence, which they are thus bound to build or repair, provided such injury arise from the intrusion of cattle, which are rightfully on the adjoining land. The rights of persons, not having any interest in either of the adjoining closes, remain unaffected by the statute, and are to be defined and protected by the common law. (6 *Mass. Rep.* 97-8.) When the proportion has been ascertained, instead of averring, in pleading, that a tenant has used, by prescription, to make and repair, in the technical form, it is sufficient to allege, that he is obliged, by law, to make and repair, and give the assignment in evidence. (*Id.* 96.)

2. An agreement, settling the proportions of the partition fence, would, doubtless, have the same effect as an assignment under the statute; though, in order to be effectual, it must be made between the parties to the suit, or those under whom they claim. (4 *John. Rep.* 414-15. 6 *Mass. Rep.* 97.) Ch. Justice *Parsons,* in speaking of these agreements, says, that, "When there has been no assignment, but only an agreement executed by the tenants of the adjoining closes, it may be a question whether such agreement shall have the force of an assignment, and if not, whether the tenant, whose cattle have escaped, can plead such agreement in bar of an action of trespass, or must have his remedy by an action on the agreement. It is true, that a *curia claudenda* does not lie, but against a tenant, who is obliged by *prescription* to repair. And, by analogy, an agreement between the tenants, making a division of the fence, each one mutually undertaking to repair his part, would not authorise one tenant, who had made or repaired the fence of the other, on his refusal, to recover of him the expense. But there appears to be no good reason, after an actual division by such agreement, if the cattle of one tenant escape into the close of the other tenant, through the defect of the fence, which the other had agreed to make and repair, why the owner of the cattle might not aver, that the party com-

*Curia.* The Justice erred in permitting the witness to state his *belief*, after he had sworn *that there was nothing in the conversation, from which he could say that the plaintiff referred to the time of the sale.*

Judgment reversed. (*a*)

(*a*) When a witness may give his opinion, vid. 1 *Phil. Ev.* 226, and the cases there cited. The 2 *Am. ed.* p. 209, contains the cases more fully. In *Snell et al.* v. *Moses et al.* (1 *John. Rep.* 96,) a witness was allowed by *Livingston, J.* at *nisi prius*, to give his impression as to the substance of a conversation.

plaining had bound himself by his agreement, to make and maintain the fence, and that the cattle escaped through his default; for if he had agreed to make and repair the fence, he ought, by law, to fulfil his agreement. Prescription to fence, is allowed at the common law, as resulting from an original grant or agreement, the evidence of which is lost by the lapse of time; and it is reasonable that the agreement produced, should be as effectual as a presumption, that it once existed, but is lost, arising from ancient usage." (6 *Mass. Rep.* 96, 7.) And it has been determined in this state, that where the party has, for several years, kept up a certain part of the division fence as his own, this is, *prima facie*, enough to shew that it belongs to him. (15 *John.* 220, 1.)

3. Prescription may form another exception to the common law. The country has now been settled long enough to allow of the time necessary to prove a prescription, (vid. 2 *John. Rep.* 357;) and ancient assignments of fence viewers, made under the late colonial laws, and also ancient agree ; ments made by the parties, may have once existed, and be now lost by the lapse of time. (6 *Mass. Rep.* 97.)

It seems, then, that the owner of the cattle may aver, 1. That the party complaining, ought, by law, to make and maintain his fence, in which case he may prove the assignment or apportionment by the fence viewers; or, 2. That he is bound by agreement, to make and repair the fence, setting out the agreement in pleading, and proving it accordingly; or, 3. That he was bound by prescription, when he should regularly plead the prescription, and may prove it by ancient usage. (*Id.* 97, and vid. *The opinion of Popham, J.* in *Nowell* v. *Smith*, against the other Judges, *Cro. Eliz.* 709.)

These statutory provisions oblige a tenant to fence against such cattle *only* as are rightfully on the adjoining land. Beyond this, all rights remain as at common law; at which, says Ch. Justice *Parsons*, " when a man was obliged by prescription to fence his close, he was not obliged to fence against

VAN DeVEER
v.
STANTON.

VAN DE VEER *against* STANTON—*Certiorari from a Justice's Court.*

TRESPASS, in the Court below, by *Van De Veer* against *Stanton.* After issue, the defendant made affidavit, that the Justice was a material witness for him, as he was advised by his counsel, and verily believed, of which he was not apprized till after the adjournment; and moved for a non-suit. The plaintiff offered that the Justice might, on the trial, state the statement of the justice might be received as legal evidence, to which the defendant refused to accede, and the justice non-suited the plaintiff, with costs, the judgment was reversed on certiorari.

*Where the defendant made affidavit, that the justice was a material witness, and moved for a nonsuit; and the plaintiff of-fered that the*

any cattle, but those which were rightfully in the adjoining close. (10 *E.* 4. 7, 8. 22 *E.* 4. *Fitz. Abr. Curia Claudenda,* 2. *Jenk.* 4 *Cent. ca.* 5.) But the owner of the cattle may avail himself of the insufficiency of the fence of the close injured, if he has an interest in the adjoining close, to authorise him to put his cattle there, as a right of way, an highway, a license, a lease, or a right of common. (*Fitz. N. B.* 298, *note.*)

" Against this position, the plaintiff has cited *Fitz. Abr.* 298, *note* 6, where it is said that if A be bound to fence against B, and B against C, and beasts escape out of the land of C, into the land of B, and thence into the land of A, A shall not maintain trespass against C. But if A be bound to fence against B, and the beasts of B escape into the lands of A, and thence into the lands of D, a stranger, D may maintain trespass against B, who shall be left to his *curia claudenda* against A. By calling D a stranger, I suppose is meant, that neither A nor D is bound to fence against each other. For this distinction is cited, 10 *E.* 4. 7, and 36 *H.* 6. *Fitz. Abr. Cur. Claud. Bar.* 168.

" As this distinction is not supported, but opposed by other cases, we have looked into the authorities cited. The 10 *E.* 4. 7, clearly proves that D may maintain his action. It is thus laid down by *Choke,* justice, " If I have " a close between the close of A, on one side, and the close of B, on the oth-" er side, which I ought to fence; and through defect of fence, A's cattle " escape into my close, I can have no action, for it is through my own de-" fault. But if they pass through my close into the close of B, he may " have an action against A, who shall be put to his writ de *curia claudenda* against me."—The case of 36 *H.* 6. is not reported in the year books, but there is a short statement of it in *Fitz. Abr. Bar.* 168. And I believe the distinction arose from a mistake of the case. It is thus : " *Note,* that it was "adjudged by the court, if my beasts go into the close of another [*de autre*]

any facts within his knowledge, which should be received as evidence, to which the defendant refused to accede.— Whereupon, the Justice non-suited the plaintiff, and gave judgment for the defendant, for his costs, although the defendant expressly waived all costs, and told the Justice he should ask none.

*J. J. Danforth*, for the plaintiff in error.

*Fish & Eacker*, contra.

*Curia.* The Justice erred in non-suiting the plaintiff; and having given judgment against him for costs, error lies.(a)

Judgment reversed.

(a) *Smith* v. *Sutts*, 2 *John. Rep.* 9. *Wilson* v. *Foree*, 6 *id.* 110. *Schermerhorn* v. *Jenkins*, 7 *id.* 373.

___

" which is adjoining to my close, for the defect of the close of the other, " [*de l'autre*] and further go into another [*autre*] close of the other, " [*de l'autre*] that I shall not be punished, because I do not retake them, " and put them again into my close, until reparation be made of the other " close, because they would go again," &c. Now, by mistaking the third close for a close of a third person, who, because of the defect of his own fence, could maintain no action against the owner of the cattle, the distinction arose, but it is not well founded. That I have given the true translation, appears from *Jenk.* 4 *Cent ca.* 5. The rule, as there laid down, is, if A has *Green acre*, adjoining to his own close *White acre*, which adjoins to B's close *Black acre*, which A ought to fence against : If B's cattle go from his *Black acre*, to A's *White acre*, and thence to A's *Green acre*, this is no trespass, because A did not fence his *White acre* against B's *Black acre*. This seems to be the same case of 36 *H.* 6. stated in *Fitz. Bar.* 168.

" We therefore consider it settled at the common law, that the tenant of any close is not obliged to fence, but against cattle which are rightfully on the adjoining land. And accordingly, in the entries, where defect of inclosure is pleaded, the party pleading it claims some right or interest in the adjoining close, whence the escape was made, or justifies under those who have such right or interest. (*Rast. Ent.* 620, *b.* 622. 6 *Inst. Cler.* 677, 680, *and the entries there cited.*)"

It was upon these principles that *Rust* v. *Low & Stanwood*, (6 *Mass. Rep.* 90,) was determined. This case settles directly the doctrine before advanced, that one is not bound to fence, except against such cattle only as are lawfully in the adjoining close ; and it also decides that those cattle cannot be said to be lawfully there, which have broken in, through the defect or absence of a fence, which the owner of a close adjoining, in another place, is bound

BAYLESS *against* CRANY—*Certiorari from the Assistant Justice's Court of the city of New-York.*

An assistant justice is bound to issue a venire, if demanded, on the same day on which the first order for an adjournment is made, after issue, and before proceeding to inquire into the merits of the cause.    Proceeding to inquire into the merits, means the investigation of the merits, by an examination of witnesses, or other testimony.

ASSUMPSIT, in the Court below, by *Crany* against *Bayless.* Issue was joined July 15th, 1822, and the cause was adjourned, on the plaintiff's request, to 3 P. M. of the same day, when the defendant requested a further adjournment to the 18th (then) instant, and that the cause should be tried by jury. The Justice granted the adjournment, but refused a venire

to build and repair. In that case, the defendants, as bailiffs of *Trask*, made cognizance of taking the plaintiff's cattle, *damage feasant*, in *Trask's* close. The plaintiff pleaded that he was seized of a close, called *Biscay Island,* which was enclosed by a fence ; that to his close was adjoined *Trask's close,* the *locus in quo*, *Rigg's close*, and also *Low's close ;* that *Rigg's close* was also adjoining upon *Trask's close ;* and that *Low's close* was adjoining to *Rigg's close,* thus :

| Rust's close, called Biscay Island. | | |
|---|---|---|
| Low. | Riggs. | Trask, locus in quo. |

That the partition fence, between the plaintiff's close and the *locus in quo*, was undivided, and that he and *Trask* were jointly and equally bound, by law, to make and maintain the same ; and the same as to the partition fence between the plaintiff and *Low*, who were jointly, &c. bound, by law, to make and maintain the same. That the same partition fences were, in all parts, not legal and sufficient ; that the plaintiff put the cattle in his own close, to depasture, whence they escaped into *Low's* close, through the insufficiency of the partition fence ; thence into *Riggs'* close, for want of any partition fence between his and *Low's* closes ; and thence into the *locus in quo*, because there was no partition fence between *Riggs* and *Trask*. On demurrer, judgment was given for the defendants. And the Court took the ground, that, had the cattle escaped directly from the plaintiff's into

nire. Judgment for the plaintiff. The question was, wheth-er it was too late to demand a venire after the first adjourn-ment.

*D. Rogers,* for the plaintiff in error.

*W. L. Rose,* contra.

*Curia.* By statute, (*sess.* 36, *ch.* 86, *s.* 95, 2 *R. L.* 374,) it is lawful for either of the parties, after issue joined, and before the Court shall *proceed to inquire into the merits of the cause,* to demand a trial by jury. By the act, (*sess.* 43, *ch.* 1, *s.* 3,) this cannot be done, " after the day in which an order has been made for an adjournment." The application for a jury having been made the *same* day on which the first order

---

*Trask's* close, he, being as much bound to repair as *Trask,* could not allege the insufficiency of the fence, against the latter ; nor could he allege the deficiency of the fence, between him and *Low,* the place where the cattle es-caped, he and *Low* being equally bound to repair their partition fence; and that, in fine, it was immaterial whether the cattle escaped through *Low's* default, or not. *Low* and *Riggs,* for aught that appeared, were not bound to make a partition fence, between them, and *Low* was obliged, at his peril, if the cattle were rightfully there, to prevent their escape into *Riggs'* close. The cattle were, by wrong, on *Riggs'* close, being trespassers, by escaping from *Low's* close, and *Trask* was not bound to fence against them, because *Rust* had no right to put his cattle there. And, indeed, that if the cattle had escaped through the defect of *Low's* fence, the plaintiff could not maintain *replevin* against the bailiffs of *Trask,* but must bring case against *Low.* (Vid. *Cro. Jac.* 665, *Holbeck* v. *Warner.* 1 *Salk.* 335, *Star* v. *Rookesby.*)

Cattle, in the highway, are spoken of, by Ch. J. *Parsons,* as being in a place against which the tenant is obliged to fence, because such cattle are lawfully there ; and he cites *Fitz. N. B.* 298, *note,* to prove his position. But this should be understood with its proper qualifications. The note referred to quotes three authorities from the year books, viz : 15 *H.* 7. 17 ; 22 *Ed.* 4. 8, 49, and 10 *Ed.* 4. 8, as proving this, and this only, *that if beasts escape, in view of the owner, by default of enclosure, as out of a highway, &c. fresh suit may be shewn in justification; but, if it does not appear they were in view of the owner, fresh suit shall not be pleaded in bar, except the plaintiff alleges notice.* These cases, evidently, suppose the owner travelling with his beasts, or, at least, that they are turned into the road merely to travel from one point to another, without his presence : but the owner has no more right to turn his beasts into the highway, or suffer them to run there, for the purposes of grazing, than he has to turn them into his neighbour's cornfield. And this is also evident, from a pleading in *Herne,* 828. Indeed,

for an adjournment took place, but not till after that adjourn-ment, the only question is, whether the first adjournment was a " proceed'ng to inquire into the merits." By " proceed-ing to inquire, &c." we understand, *the investigation of the merits, by an examination of witnesses, or other testimony.* (*Cowen's Treat.* 526.) It is said that *Cowen* cites *no authori-ty.* He is, however, supported in the: *dictum* by *Olney* v. *Bacon,* (1 *John. Rep.* 142,) and there are repeated decisions of this Court, recognizing a Justice's right to issue a venire after an adjournment. (*Vid.* 2 *Caines,* 137, *and Sebring* v. *Wheedon,* 8 *John. Rep.* 460.)

Judgment reversed.

this point is now established, both in Massachusetts and in this state. (16 *Mass. Rep.* 33. 19 *John.* 385, and vid. 2 *H. Bl.* 527, *S. P.*) And if cat-tle, so on the highway, for the purposes of grazing, escape into the adjoining close, the owner of the cattle cannot avail himself of the insufficiency of the fences, in excuse of the trespass, (*id. ibid.*) for the publick have no right in a highway, except to pass and repass thereon. (1 *Burr.* 143. 2 *Str.* 1004. 1 *Wils.* 107. 6 *East,* 154. 2 *John. Rep.* 357, 363. 6 *Mass. Rep.* 454. 15 *John.* 453. 13 *Mass. Rep.* 256. 16 *id.* 33.)

Have towns, or even the legislature, the power to interfere with com-mon law rights, by authorizing cattle, &c. to run at large in the highway? The question has never arisen in our Courts, though some of our authori-ties look like taking it for granted. (12 *John.* 433. 19 *id.* 385.) And many towns, in practice, assume to exercise this right. Without examin-ing the constitutional right of the legislature, to thus take the property of one man and give it to another, I imagine it will be found that no such power was ever intended to be given, by any act of the legislature of this state. The only existing statute, is the one before cited, (2 *R. L.* 131, *s.* 12,) which gives towns the power *to direct the use and management of their common lands, and the times, &c. of permitting or preventing cattle, horses, sheep, swine, &c. to go at large.* Now they have a much stronger statute in *Massachusetts,* which has been held not to have this effect. Their colonial acts, like ours, began with mentioning *commons,* spoke of cattle, &c. *going at large,* on the *commons;* others, like our statute, of their going at large, gen-erally, without confining it to commons ; and one act, passed there, regu-lated the manner in which horses might go at large, on the *commons* or *ways* of any town ; and towns are authorized, in that state, to grant liberty for horses *to go at large,* and unfettered; and so in relation to other cattle. Yet, in *Stackpole et al.* v. *Healy,* (16 *Mass. Rep.* 33.) the Supreme Court of that state held, unanimously, that these expressions might all be satisfied,

by referring to *a running at large in the common lands of towns,* and did not extend to *highways.* They reason thus: " Did the legislature mean to touch rights protected by the common law? I may ask another question : could they do so, if they were disposed, (which is a case never to be supposed) without making compensation to the owner? Take the case of a fruit tree, standing in the road, but in a situation to afford a convenient shade to the traveller; an ornament, but not a nuisance, to the way; and yielding an annual profit to the owner of the soil. Now, the legislature might, if they thought it expedient, provide, by law, that, for the future, the soil of all highways, that should be laid out, should be vested in the publick; and compensate the owner accordingly. But what constitutional right would they have to divest the owners of the soil of rights remaining, in respect to ways heretofore laid out?" (*Id.* 36-7.) Again: " The pasturage never made any part of the inducement or reason for laying out highways." (*Id.* 37, and vid. the book last quoted, 35-6, for a history of the statutes of *Massachusetts,* on this subject.)