(No. 4576— )

JACK PULIZZANO, A MINOR, BY HIS FATHER AND NEXT FRIEND, NICK PULIZZANO, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed February 26, 1954.*
*Supplemental Opinion filed March 16, 1956.*

ROBERT F. DOYLE, Attorney for Claimant.

LATHAM CASTLE, Attorney General; A. ZOLA GROVES, Assistant Attorney General, for Respondent.

WHAM, J.

This case is before us on a motion by respondent to strike and dismiss the complaint filed herein by claimant, which complaint prays damages for injuries allegedly suffered by claimant by reason of certain acts of negligence on the part of agents of respondent in maintaining certain portions of Starved Rock State Park.

Paragraph 2 of the motion to strike points out a specific defect, namely, that there is no allegation of due care and caution on the part of claimant.

Paragraphs 1 and 3 of the motion to strike and dismiss are in the nature of a general demurrer to the complaint.

Claimant has filed an answer to the motion to strike. In paragraph 1 of said answer, claimant acknowledges the defects specifically pointed out in the motion of respondent, and requests permission to amend paragraph 2 of his complaint to read as follows:

"2. That on or about the 1st day of August A. D. 1953, claimant, Jack Pulizzano, a minor, was walking upon certain pathways, located in said park, at or near Canyon Drive, and he was, at all times, in the exercise of ordinary care and caution for his own safety."

The motion to amend the complaint, as above set forth, is hereby allowed.

In paragraph 2 of claimant's answer, he moves to strike respondent's motion to strike and dismiss for the reason that said motion is a general motion, and does not set out specifically wherein the complaint is insufficient. Claimant's motion in the above respect is proper, and will be allowed.

Rule 2 of the Rules of the Court of Claims of the State of Illinois provides:

"Pleadings and practice, as provided by the Civil Practice Act of Illinois, shall be followed except as herein otherwise provided."

Paragraph 45 of the Civil Practice Act of the State of Illinois provides in part as follows:

"All objections to pleadings heretofore raised by demurrer shall be raised by motion. Such motion shall point out specifically the defects complained of . . ."

Nowhere in respondent's motion are there any defects specifically pointed out, other than failure to plead due care and caution, which has been heretofore disposed of in this opinion.

Respondent's motion is in the nature of a general demurrer. In the case of *Teren* vs. *City of Chicago,* 413 Ill. 141, at page 144, the Supreme Court held that Section 45 of the Civil Practice Act has:

". . . abolished all demurrers and substituted therefor a motion, which may only be in the nature of a special demurrer, specifically pointing out the defect of which the motion complains. There exists no motion in the nature of a general demurrer."

In the case of *Gulf, M. & O. R. Co.* vs. *Arthur Dixon Transfer Co.,* 343 Ill. App. 148, the court said at page 151:

"Section 45 of the Civil Practice Act (Ill. Rev. Stats., 1949; Jones Ill. Stats. Ann. 104.045) specifically provides that all objections to pleadings heretofore raised by demurrer shall be raised by motion, and that the motion shall point out specifically the defects complained of; that where a pleading is objected to on the ground that it is substantially insufficient in law, the motion must specify wherein such pleading is insufficient. The courts have sustained this provision of the Act, and interpreted it to mean what it so clearly states."

Claimant's motion to strike respondent's motion to strike and dismiss the complaint is, therefore, allowed as to paragraphs 1 and 3 thereof.

Supplemental Opinion.

This action is brought by claimant, Jack Pulizzano, a minor, by his father and next friend, Nick Pulizzano, against respondent, State of Illinois, to recover $7,500.00 in damages for personal injuries sustained by Jack Pulizzano, and $5,000.00 for loss of services to and medical expenses incurred by Nick Pulizzano, the father.

Claimant, Jack Pulizzano, sustained a broken leg and other injuries when he fell in Starved Rock State Park at a point near Canyon Drive at approximately 12:00 o'clock midnight on August 1, 1953.

The complaint charges that: (1) The park was open to the public, and the public was invited to enter; (2) Jack Pulizzano was walking upon a certain pathway located in Starved Rock State Park in or near Canyon Drive; (3) Respondent was negligent in one or more of the following particulars: (a) Failing to maintain said pathway in a safe condition; (b) Failing to inspect said pathway to discover the existence of an unsafe condition; (c) Failing to post signs warning the public not to use said pathway; (d) Failing to have hand rails or guards upon said pathway; (4) As a proximate result of one or more of said acts of negligence, Jack Pulizzano was caused to and did enter upon the pathway in response to a cry for help, and was caused to and did slip and fall off of said pathway causing his injuries.

The record reflects the following facts: Claimant, a young man fifteen years of age, together with three other boys, David Kawalski, Raymond Waltz and Loren McLain, and a girl named Peggy Bisgaard, all residents of Chicago, Illinois, left Chicago in a Ford panel truck early in the afternoon of August 1, 1953, and drove to Utica,

Illinois for the purpose of seining minnows in the Illinois River nearby for claimant's father, who operated a bait store. They were at the river seining for a short time, after having stopped for dinner at a roadside place.

Upon leaving the river, they drove to the state park by way of Route No. 71, and parked their truck on a lot near an opening into the park. It was approximately midnight when they arrived. Claimant, when asked the question why they stopped at that particular spot to enter the park, stated that "We were looking for some place else to go, but we could not find any place to park". He also stated that they stopped "Just to see what was there". When asked by the Commissioner "What could you see at midninght?", claimant replied, "We could not see anything". And when pressed further for an explanation as to "Why did you go then?", replied "Something to do". He further testified he had been to the park on previous occasions. On direct examination, he stated the occasion for their stopping at the park was "sight-seeing". Although claimant denied that they planned to seine minnows in the park, Raymond Waltz, one of claimant's companions, stated on cross-examination, when asked why they came to this particular spot, that he had been with claimant's brother some two or three years prior to the date of the accident while going for minnows, "found a canyon in there somewhere", and that the night of the accident he, the witness, "couldn't remember where it was exactly, and we were riding around, and we wound up in this one here. It wasn't the same one".

The only other reason given for the visit to the park was by David Kawalski, another companion of claimant, who, in answer to a question by the Commissioner as to

why they were there, stated, "We wanted to see what it looked like".

Whatever the purpose for the visit was, the parking lot from where they entered was not the main entrance, but rather a parking area, which is usually used by nature study groups to gain access to the regular trail system that runs throughout the park.

After stopping and parking their truck, claimant and his companions walked through an opening in the fence and down a flight of 32 gravel and railroad tie stairs to a regularly maintained nature trail at the bottom of the stairway, intending to go down into a canyon. They then turned left onto the nature trail, and walked a short distance, at which time claimant, Peggy Bisgaard and Raymond Waltz decided to go no further, because they thought it was unsafe, and attempted to persuade the other two boys to return to the truck, but to no avail. The night was particularly dark, and the only means of illumination was one flashlight, admittedly dim, which was in the possession of Raymond Waltz.

The testimony concerning the physical characteristics of this particular area, as we are able to determine from the record and exhibits, shows this portion of the park to be a rough, wooded and rocky area running along the rim of Tonti Canyon and LaSalle Canyon. The maintained nature trail, reached by the stairs, which claimant and his companions descended, is a gravel trail approximately three and one-half to four feet wide with a relatively level and smooth surface following the contour of the land, and running parallel to the rim of the canyon.

The custodian of Starved Rock State Park, Mr. Clarence S. Martin, stated that in pursuing his duties he often inspected the trails of the park, and that just

prior to August 1, 1953 he had inspected the particular trail involved, and found it to be in good condition.

Mr. Xavier C. Marr, landscape architect with the Department of Conservation, State of Illinois, testified that at this particular area the trail ran approximately 42 feet from the brink of the canyon. The topography of the ground between the trail and the brink of the canyon was a dense undergrowth of brush, trees, fallen limbs, leaves, roots from the trees and projecting stones, sloping generally toward the brink of the canyon with a 10 to 12 foot difference in elevation between the trail and the brink of the canyon. This area was broken in a number of places by washes made by drainage of surface water from rains coming down the slope of the hill above the trail and continuing on down the slope from the trail to the brink of the canyon. There were two washes in the vicinity of the intersection of the steps with the trail. One started above the trail at approximately the 11th step of the stairway, and angled down across the trail toward the canyon. It was approximately 4 to 6 inches in depth and 12 to 14 inches in width. It was bare earth winding, jagged and irregular with exposed roots. The record establishes that this particular wash is several yards to the west of the intersection of the stairs with the main trail, being to a person's left as he descends the steps.

The other wash started from the edge of the trail at the bottom of the steps, and wound down toward the brink of the canyon. The record establishes that it was almost entirely of exposed stone, extremely rugged and impassable, varying from 24 inches to 10 feet in width.

After claimant and the two others decided to return to the truck, David Kawalski and Loren McLain continued to their left, or to the west, along the trail with-

out the flashlight. They continued on the trail for about 20 feet, then left it, and started down the slope toward the canyon. They were following no trail or path, and continued down over some boulders into the canyon, where David Kawalski fell hurting his leg. At the time he fell, he was at the bottom of the canyon near a small creek. This canyon floor was approximately 100 feet below the trail level. Upon falling, David Kawalski and Loren McLain called to the others to come down that "David broke his leg".

Upon hearing the cry for help, claimant and Raymond Waltz started down the stairway, claimant following Waltz, who was holding the flashlight. Claimant stated that they went down the stairs two at a time, and that, upon reaching the bottom of the stairs, they turned to the left, and ran on the trail for five or ten feet, with claimant following Waltz. Waltz directed the light downward to the right of the trail looking for some way, an opening, to start down toward the canyon. He stated that he came to an opening between the trees, left the trail, and started down toward the canyon. He stated that it did not look like a regular "pathway" in the park, and did not look like the trail that they were on from the stairs, but looked to him like some way to go down. He stated that he could hear the voices of the two boys in the canyon, and was trying to follow their voices. Waltz couldn't say how far they went after leaving the trail, but all of a sudden he went over the edge of the canyon, but managed to catch onto a vine.

After he had gone over the edge, and was hanging by one hand, he called for claimant, Jack Pulizzano, to help him. Claimant saw him dangling over the edge of the

canyon, sat down near the edge reaching for him, and was either pulled over the edge by Waltz or slid over. He fell down into the canyon, landing approximately 25 to 30 feet away from the two boys in the bottom of the canyon, and sustained a broken leg. He was then taken to the hospital and given medical treatment.

Claimant contends in his brief that the wash leading from the trail to the brink of the canyon appeared to be a path, and that respondent was negligent in failing to post warning signs and guardrails to indicate where the trail ended, and to barricade the wash. Claimant also contends that respondent had used one of these washes in carrying lumber from the trail down to the cliff, and that sightseers often went off of the trail toward the cliff to take pictures, leaving pathways where they traveled. In short, it appears to be claimant's contention that respondent was negligent in allowing a condition to exist, whereby claimant and his companion, Raymond Waltz, were lured off of the main path into a place of danger by reason of the alleged negligence of respondent.

There are several questions in this case, which have not been answered to our satisfaction, one of which is the purpose that claimant and his companions had in being upon these premises at midnight. Irrespective of this, however, we intend to only address ourselves to the question of respondent's alleged negligence, since we feel that an analysis of the facts and the law show respondent was not negligent as contended by claimant.

The system of state parks in Illinois is provided for in Chap. 105, Ill. Rev. Stats., (1953 State Bar Association Edition). Among other things, the purposes and objectives of the system are stated in Par. 466(2): ''To set aside as public reservations those locations, which have

unusual scenic attraction caused by geologic or topographic formations, such as canyons, gorges, caves, dunes, beaches, moraines, palisades, examples of Illinois prairie, and points of scientific interest to botanists and naturalists''.

The Legislature further directed in Par. 467 that, in maintaining state parks, the Department of Conservation shall ''conserve the original character as distinguished from artificial landscaping of such parks''.

The powers of the Department of Conservation, among other things, are set out in Par. 468 of the statute, being to ''lay out, construct and maintain all needful roads, parking areas, paths or trails, bridges, etc.'' in the state parks.

It is apparent from the exhibits and the testimony that the particular portion of Starved Rock Park here involved was intended to be, and was maintained in a rugged natural state as a scenic attraction, and that the trailways were constructed so that the public could view the natural beauties of the area.

The evidence reflects no negligence in the manner of the construction or maintenance of the trail. It was located some 42 feet from the edge of the canyon. It does not appear to us that a person using this trail, as it was intended to be used, could possibly have been misled into considering the washes or meandering paths made by the wanderings of the public to be a state maintained trail upon which they could travel in safety.

By the very nature of this portion of the park, it is obvious to us that daytime hiking was the particular activity contemplated by the state in maintaining the trailways, and that, if the trails were to be used in the night time at all, the users would provide their own

adequate illumination, and accept the obvious risks brought on by the darkness, especially if departure was made from the trail.

The invitation to use this public park is in no sense an absolute one. It is rather an invitation to use the particular facilities in the manner in which and for the purposes of which they were designed and intended. The state is not required to maintain its parks in such condition that patrons may wander at will over each and every portion thereof.

In *Kamin* vs. *State of Illinois*, 21 C.C.R. 467, we announced the rule that a determination of what constituted reasonable care in the maintenance of a trail or pathway in a state park depended upon the location, character and extent of the use to which the particular trail was put. We also held that the state was under no duty to maintain guardrails along the side of the trail at the point where the adjoining canyon was readily visible to users of the trail. In the instant case, although it was dark, claimant and all of his companions knew that a canyon was in the vicinity, and, in fact, intentionally departed from the trail some distance before ever encountering the danger of falling over the brink of the canyon.

The same thing might be said with respect to claimant's contention that warning signs should have been in place. Warning signs only serve to notify persons of an existing danger. If the danger is known, a warning sign is useless. If there had been posted upon every foot of this trail notices that there was a canyon in the vicinity, such notices would have warned only of that which surely would have been known by anyone using that

portion of the park in a manner and at a time reasonably foreseeable by respondent.

We have here a situation wherein two boys in the blackness of a dark midnight knowingly left the safety of a regularly established trail, and went down into the canyon 100 feet below for the only avowed purpose of "seeing what was there". It does not seem to us that it would be proper to place the state under a duty to foresee and prepare for such activity at that time of night, and to further anticipate that claimant might sustain an injury in responding to a cry for help from one of the boys in the bottom of the canyon.

Although the injury to claimant was unfortunate, and although his response to a cry for help is admirable, we cannot find from the facts and the law involved in this case that the State of Illinois did anything contrary to good practice in the operation of its parks, which proximately caused either the dilemma of the boy, who fell in the canyon, and cried for help, or the fall of Raymond Waltz over the cliff, resulting in his attempted rescue by claimant, and claimant's fall to the bottom of the canyon.

We have, in deciding this case, assumed, but not determined, that claimant was entitled to the exercise of due care by respondent. Upon such an assumption, the opinion of *Altepeter* vs. *Virgil State Bank*, 345 Ill. App. 585, wherein Pollock on Torts is quoted, states the proper rule to be followed in determining what is or is not negligence on the part of respondent:

" 'If men went about to guard themselves against every risk to themselves or others which might, by ingenious conjecture, be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that

are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' "

An excellent statement applying this rule to which we adhere is found in *Menestrina* vs. *St. Louis National Stock Yards*, 278 Ill. App. 342 at 348 and 349:

"The owner of premises is bound to use reasonable care in so maintaining his property, that those who come thereon by his invitation, whether express or implied, may do so in safety, and if he fails in such duty, and an invitee is injured as a consequence, without negligence or fault on his part, the owner will be required to respond in damages. (Citing cases.)

The rule, however, does not require that the owner foresee and guard against, or take precautionary measures to avert accidents or injuries, resultant from unusual and unexpected occurrences, which could not have been reasonably anticipated, and would not have happened unless under exceptional and extraordinary circumstances. (Citing cases.)

The accident in question was most peculiar and unusual, and one the ordinary mind, which can be guided only by a reasonable estimate of probabilities, would not have anticipated would occur. To hold the owner to have foreseen and guarded against an event so rare and unexpected, would be to practically hold it as an insurer against any accident, which human caution or foresight could prevent—a responsibility not exacted by the law. (Citing cases.)"

Since we can not find upon the record in this case that respondent should be held to have foreseen and guarded against the occurrence of this accident, we, therefore, must hold that neither of the claimants are entitled to recover any amount of damages.

In view of the above, we need not determine the question as to whether claimant has established that he was upon the premises in such a relationship with respondent, and for such a purpose, as to entitle him to the duty owed an invitee or patron of a park under the doctrine of *Kamin* vs. *State of Illinois*, 21 C.C.R. 467. In that case we adopted the rule that a patron of a state park, properly upon the premises, is entitled to the exercise of reasonable care by respondent. By not pass-

ing on this question, we do not imply that the record in this case is sufficient to establish such relationship.

The claims are hereby denied.