Carolyn L. DUCEY, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Lois M. OLSON, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Helen GRUGEL, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. Civ. LV76–245 RDF, LV75–201 RDF and LV77–59 RDF.

United States District Court, D. Nevada.

Sept. 17, 1981.

---

Lamond R. Mills, U. S. Atty., by William C. Turner, Asst. U. S. Atty., Las Vegas, Nev., for defendant.

A. Bennett Combs, Arthur J. Jaffee, Pomona, Cal., for all plaintiffs.

Lorin D. Parraguirre, Las Vegas, Nev., for plaintiffs Olson.

Thomas J. Brown, Santa Ana, Cal., for plaintiffs Grugel.

## DECISION

ROGER D. FOLEY, District Judge.

### Statement of Facts

These consolidated actions were brought against the United States under the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346(b) and 2671 et seq. for damages for wrongful death of plaintiffs' decedents during a flash flood which occurred on September 14, 1974, at the Lake Mead National Recreational Area in Southern Nevada.

The flood occurred on a flood plain in a portion of the recreational area known as Eldorado Canyon on the Nevada side of Lake Mohave, land owned by the United States. Eldorado Canyon is 25 miles south of Hoover Dam and 40 miles north of Davis Dam on the Colorado River. On the flood plain of Eldorado Canyon where it empties

into Lake Mead, there are various concessions operated for profit under a contract between the Secretary of the Interior, acting through the Director of the National Park Service, and Eldorado Canyon, Inc., an independent contractor. The written concession agreement is plaintiffs' Exhibit No. 4 [1] and it provides in Section 2 as follows:

"SEC. *2. Accommodations, Facilities, and Services Authorized.*

"(a) The Secretary authorizes the Concessioner, during the term of this contract, to provide accommodations, facilities, and services for the public within the Eldorado Canyon Site, Lake Mead National Recreation Area, as follows:

"1. Marina services and facilities, including docks, boat moorings, fueling facilities, and boat repair service.

"2. Boat and boat trailer storage facilities, including watchman service.

"3. Rental and sale of boats and motors.

"4. Boating services, including chartered and scheduled boat trips originating at the Eldorado Canyon site, and fishing guide service.

"5. Automobile fueling facilities.

"6. Overnight accommodations, including cabin and trailer rentals.

"7. Trailer site rentals.

"8. Food and beverage service facilities.

"9. Merchandising facilities.

"10. Any and all facilities and services which are customary in connection with such operations."

The parties have stipulated, and the evidence establishes, that on the 14th day of September 1974, each of the plaintiffs' decedents was present at Eldorado Canyon for recreational purposes and that they had not paid a fee to the National Park Service, or any agent or employee of the United States, to gain entrance into the Lake Mead National Recreational Area and, in particular, Eldorado Canyon, to engage in recreational activities or to use public lands in Eldorado Canyon and in Lake Mohave.

Plaintiffs' decedent Grugel had paid rent to the concessioner for the use of a boat slip and a trailer space. Plaintiffs' decedent Ducey had paid rent to the concessioner for a boat slip. Plaintiffs' decedent Olson had not paid any like payments to a concessioner.

Under the concession agreement, all money paid for services rendered to, or for goods sold to, the public by the concessioner, were paid solely to the concessioner. The contract required that 1¾% of gross profits be paid to the Park Service annually. However, no payment was made by the concessioner to the Park Service for the calendar year 1974.

These cases were consolidated for trial on the issue of liability of the United States. The trial as to damages has been severed for a later determination if necessary. Trial took place on April 24, 25, 26 and 27, and on May 1, 2 and 3, 1979. After the transcript was prepared, the case was briefed by counsel and submitted to the Court on May 29, 1981.

### The Flood

"Abstract

"A devastating flash flood of thunderstorm origin struck Eldorado Canyon, a 22.9-square-mile drainage with a history of flooding, in Southern Nevada, at about 2:30 p. m., September 14, 1974. The flood killed at least 9 people, destroyed 5 trailer homes and damaged many others, obliterated a restaurant, destroyed 38 vehicles, 19 boat trailers, 23 boats, half of the boat-docking facilities, and the gas dock. The severe runoff resulted from intense basin-wise rain and hail at rates up to 3 inches of precipitation per half an hour. The storm moved downbasin and generally increased in intensity, which compounded runoff rates. Peak discharge was estimated to be 76,000 cubic feet per second just upstream from the developed

1. A fair reading of the concessioner agreement leads inescapably to the conclusion that the concessioner is an independent contractor.

area near the canyon mouth. About 2,000 acre-ft of runoff reached Lake Mohave, the canyon terminus. Runoff dumped an estimated 70,000 cubic yards (about 100,000 tons) of inorganic sediment in Lake Mohave and throughout the lowermost canyon reach. It also delivered an estimated 4 acre-ft of organic or floating debris to Lake Mohave. The inorganic sediment was estimated to be less than 1 percent boulders, 40 to 60 percent gravel, 20 to 40 percent sand, and 10 to 25 percent silt-clay. Although the recurrence interval for this magnitude runoff is great, a similar flood could occur in any given year. These types of flash floods, although common in the desert southwest, are not fully understood and are frequently ignored, and therefore the danger to developed areas is not decreased. With proper understanding and informed planning, the risk of damage from similar floods in the future can be greatly reduced." [2]

### The Law

■ The Federal Tort Claims Act allows recovery of damages for injury:

"caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Therefore, this Court must apply Nevada law.

■ Employees of the Government include officers and employees of any federal agency. Federal agencies do not include independent contractors. Title 28 U.S.C. § 2671. The United States is not liable for the negligence of its independent contractors. *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).

It is undisputed that plaintiffs' decedents were engaged in recreational activities when they suffered death in the flood.

*Nevada Revised Statutes* 41.510, subsection 1, provides in pertinent part:

"1. An owner, . . . of premises owes no duty to keep the premises safe for entry or use by others for . . . any . . . recreational purposes, or to give any warning of any hazardous condition, . . . on such premises to persons entering for such purposes, except as provided in subsection 3 of this section."

*NRS 41.510*, subsection 3, provides in pertinent part:

"3. This section does not limit the liability which would otherwise exist for:

(a) Willful or malicious failure to guard, or warn against, a dangerous condition . . .

(b) Injury suffered . . . where permission . . . to participate in . . . recreational activities was granted for a consideration . . ."

■ *NRS 41.510* applies to the United States as owner. *Otteson v. United States*, 622 F.2d 516 (10th Cir. 1980) (a National Forest case); *Gard v. United States*, 594 F.2d 1230 (9th Cir. 1979) (a public domain case); *Phillips v. United States*, 590 F.2d 297 (9th Cir. 1979) (a National Forest case); *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976) (a National Park Case).

■ Plaintiffs in this case cannot recover damages under Nevada law unless they can prove either that (a) federal officers or employees willfully or maliciously failed to guard or to warn against flood danger, or (b) plaintiffs' decedents were granted permission by the United States to participate in recreational activities for a consideration.

### The Consideration Exception

■ Since no consideration was paid by or on behalf of plaintiffs' decedents to the United States to enter the Lake Mead Recreational Area to engage in recreational activities or to use public facilities at Eldorado Canyon and in Lake Mohave, they do

---

2. "A Hydrologic Assessment of the September 14, 1974, Flood in Eldorado Canyon, Nevada," by Patrick A. Glancy and Lynn Harmsen (Plaintiffs' Exhibit 49).

not come within the exception of subsection 3(b) of NRS 41.510. Money paid to the concessioner is not payment to the Government.[3] Assuming arguendo that the concession contract fee of 1¾% of gross profits earned by the concessioner had in fact been paid to the National Park Service in 1974, the result would seem to be the same.

### The Willful Failure to Guard-or-Warn Exception

This Court is bound by the Nevada case law on this point as is set forth in the *Gard* cases, i. e., *Gard v. U. S.*, 420 F.Supp. 300 (N.D.Cal.1976) and *Gard v. U. S.*, 594 F.2d 1230 (9th Cir. 1979). There the district court stated, at page 302 of 420 F.Supp.:

> "Forty-three states have 'sightseer' statutes similar to NRS 41.510. The purpose of such a statute is 'to encourage owners of land within rural areas to make land and water areas available for recreational purposes by limiting their liability towards persons entering thereon for such purposes.' Colorado Rev.Stat., Title 33, Art. 41, § 101.
> The Nevada legislature clearly envisioned limiting liability under its statute to landowners who intentionally allow dangerous structures to remain unguarded and without warning, with the knowledge that someone will be injured. Under Nevada law, in order for a defendant to commit a willful injury, ' "there must be design, purpose and intent to do wrong and inflict the injury * * * " ' *Crosman v. Southern Pacific Co.*, 44 Nev. 286, 194 P. 839, 843 (1921); *Rocky Mountain Produce Trucking Co. v. Johnson*, 78 Nev. 44, 369 P.2d 198, 201 (1962). Similarly, malicious acts are those done intentionally without justification or excuse. See *Linkhart v. Savely*, 190 Or. 484, 227 P.2d 187, 197 (1951)."

and at page 304:

> "NRS 41.510, however, requires plaintiff to prove that defendant's omissions were willful or malicious. Hence, even if the United States were held negligent as a matter of law, plaintiff would not meet his burden."

On appeal, the Ninth Circuit affirmed the district court, saying, at 594 F.2d page 1233:

> "We conclude that the district court properly applied the Nevada sightseer statute and that Gard could recover only by showing willful or malicious failure to guard or warn.
> "The district court rejected Gard's assertion that the required willfulness could be found in the Government's failure to put warnings or a fence around the mine. The district court noted:
> "The Nevada legislature clearly envisioned limiting liability under its statute to landowners who intentionally allow dangerous structures to remain unguarded and without warning, with the knowledge that someone will be injured. Under Nevada law, in order for a defendant to commit a willful injury, ' "there must be design, purpose and intent to do wrong and inflict the jury * * * " ' *Crosman v. Southern Pacific Co.*, 44 Nev. 286, 194 P. 839, 843 (1921); *Rocky Mountain Produce Trucking Co. v. Johnson*, 78 Nev. 44, 369 P.2d 198, 201 (1962). Similarly, malicious acts are those done intentionally without justification or excuse. See *Linkhart v. Savely*, 190 Or. 484, 227 P.2d 187, 197 (1951)."

and at page 1234:

> "Gard responds that the district court employed too strict a test of willfulness. He argues that the court should have limited *Crosman*'s definition of willful to the context of willful injury and not willful failure. He asks that this court adopt what he considers the superior definition of willfulness employed in a decision of the Georgia Court of Appeals, reversed by the Georgia Supreme Court on other grounds. *McGruder v. Georgia Power Co.*, 126 Ga.App. 562, 191 S.E.2d 305

---

**3.** Plaintiffs make the specious argument that the concessioner's principals were employees of the United States in an attempt to make the Government responsible for the alleged torts against the plaintiffs' decedents, arguing further that the money paid to the concessioner was paid to the United States and hence NRS 41.510 does not apply.

(1972), rev'd, 229 Ga. 811, 194 S.E.2d 440 (1972). Gard claims that willfulness according to the *McGruder* definition can be proved.

"Gard, however, ignores the congressional instruction that under the Federal Tort Claims Act, 'the law of the place where the act or omission occurred' should apply. 28 U.S.C. § 1346(b); see *Martin [v. United States]* 546 F.2d [1355] at 1361 [(9th Cir.)]; *Smith,* 546 F.2d at 878–79; *Blair [v. United States]* 433 F.Supp. [217] at 219; *Hamilton [v. United States]* 371 F.Supp. [230] at 233. Thus the district court could not choose to follow whatever law it felt to be most enlightened. And *Crosman* did not limit its definition of willfulness to willful injury. In *Crosman,* a plaintiff sought to establish that the defendant had acted willfully or wantonly in failing to protect plaintiff from injury on defendant's railroad tracks, so as to circumvent the defense of contributory negligence. After adopting 'a general definition of what constitutes ... willful or wanton conduct as will warrant recovery of damages by an injured party, notwithstanding his own contributory negligence,' the Nevada Supreme Court wrote:

'It clearly appears that the conduct of respondent's employees could not have been due to willfulness, that is to say, to a design to inflict injury. The evidence shows conclusively that appellant's presence on the track was unknown to them and was not discovered before the collision ....

'Under all the circumstances in evidence, we have no hesitancy in holding that the lower court was justified in withholding the case from the jury as to any element of willfulness.'
44 Nev. at 301–02, 194 P. at 843–44. The district court found this same essential element lacking here. 420 F.Supp. at 302–03.

"In short, though we are reluctant to approve of summary judgment where willfulness is an issue, summary judgment was proper here in light of the district court's finding that '[t]he undis-

puted facts of this case fail to show that defendant ... willfully or maliciously failed to guard or warn .... Id. at 302."

■ As the Ninth Circuit stated in *Gard,* the Nevada Supreme Court, in *Crosman v. Southern Pac. Co.,* found, at page 301 of 44 Nev., 839 of 194 P.:

" 'To constitute wilful injury there must be design, purpose, and intent to do wrong and inflict the injury; while to constitute wanton negligence the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.' " 20 R.C.L. 21.

" 'The distinction between wilful and wanton injury is clearly drawn in *Atchison, T. & S. F. R. Co. v. Baker,* supra, by the following illustration:

" 'The difference is that between him who casts a missile intending that it shall strike another, and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not.'

"It clearly appears that the conduct of respondent's employees could not have been due to wilfulness, that is to say, to a design to inflict injury."

■ Applying the above construction of the willful failure to guard-or-warn exception to our case, *plaintiffs, in order to recover, would have had to prove that the officers and employees of the United States actually intended the deaths of plaintiffs' decedents, and that they had a design to cause death.* Obviously, plaintiffs have not alleged, let alone proved, such intent and therefore cannot recover.

Hopefully, the Nevada Supreme Court will soon change this harsh result by adopting a less stringent standard such as is expressed in the case of *McGruder v. Georgia Power Co.,* 126 Ga.App. 562, 191 S.E.2d 305, 307 (1972):

"A 'wilful failure' imports a conscious, knowing, voluntary, intentional failure, a purpose or willingness to make the omis-

sion, rather than a mere inadvertent, accidental, involuntary, inattentive, inert, or passive omission.... In context of the whole statute, it would seem that a wilful failure to guard or warn would require actual knowledge of the owner that its property is being used for recreational purposes; that a condition exists involving an unreasonable risk of death or serious bodily harm; that the condition is not apparent to those using the property; and that having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences. This test excludes either constructive knowledge or a duty to inspect." (citations omitted.)

If this Court were free to apply the *McGruder* test, it appears that plaintiffs would probably recover. Clearly, the plaintiffs have proven simple negligence, that is, that the Government officers and employees failed to exercise ordinary care in failing to properly post flash flood warning signs and to have developed the means to have alerted people present on or near the flood plain of the approach of the flood waters in sufficient time to reach safety.

Let judgment be entered for the defendant United States and against the plaintiffs.