Ruby M. DuMond, as Executrix of the Estate of Robert R. DuMond, Deceased, Plaintiff-Appellee, v. City of Mattoon, a Municipal Corporation, Defendant-Appellant.

Gen. No. 10,610.

Fourth District.

May 19, 1965.

Rehearing denied June 2, 1965.

Jack E. Horsley, William E. Larrabee, and Whitney D. Hardy, of Craig & Craig, of Mattoon, for appellant.

Ralph D. Glenn, of Mattoon, for appellee.

SMITH, P. J.

Defendant city was charged in Count I with negligence in the operation and maintenance of its city lake and pumping station resulting in decedent's death. Judgment for $10,000 was entered on a jury's verdict for plaintiff, post-trial motion was denied and this appeal followed. Count II charging willful and wanton misconduct was withdrawn from the jury on motion of the defendant and there is no cross-appeal from that order. No questions are raised on the pleadings.

Appellant contends (a) that decedent was at most a licensee to whom city owed an obligation not to willfully and wantonly injure, (b) that the evidence fails to show that decedent was an invitee to whom the city owed a duty to exercise ordinary care for his safety, (c) that the evidence fails to show due care on the part of the decedent and (d) that the city was free from any negligence in the operation or maintenance of its property. It is at once apparent that a determination of the status of decedent as an invitee or as a licensee is important.

The defendant city owned a lake located northeast of Neoga, Illinois. While the lake's primary purpose was to augment the city's water supply, it also had secondary recreational objectives. The lake was stocked with fish and a regulatory ordinance governing recreational facilities and uses was adopted. Decedent left his home in Mattoon alone about 2:00 p. m. for the purpose of fishing. About 8:00 p. m. his body was found within the four walls of an open intake area near the pumping station. His fishing tackle and equipment was on a ledge nearby. The original ordinance prohibited fishing in this area, but copies of it which were available and distributed to the public

had restrictive provisions marked through with a black crayon by some official of the city.

■ ■ It is abundantly clear that the city encouraged, urged and desired that its citizens make use of the lake's recreational facilities. Included in and regulated by the ordinance was fishing, boating, water skiing and swimming. We would be closing our eyes to everyday realities if we failed to note over the years the ever increasing entrance of government into the educational, cultural, recreational and public welfare aspects of everyday life. We note in passing the public golf course, swimming beach, park, playground, municipal band, hunting and fishing preserves and athletic fields, structures and auditoriums. To say that the use of these facilities by an individual is for his sole pleasure or benefit, and he is thus a mere licensee seems to us to stultify and nullify the beneficent objective which justifies their original creation and subsequent maintenance by public bodies. The body politic in the aggregate benefits or the facility is without a defensible justification. The distinction between a licensee and an invitee has been stated in 28 ILP Negligence, ¶ 52, pages 41, 42, as follows:

> "The distinction between a visitor who is a mere licensee on another's premises and one who is an invitee thereon turns largely on the nature of the business which brings him there rather than on the words or acts of the owner or person in charge of the premises which precede his coming, and an invitation may be inferred where there is a common interest or mutual advantage to be attained from the visit, while a license may be inferred where the object of the visit is the mere pleasure or benefit of the visitor. . . ."

We think it self-evident that there was a common interest in the use of the lake's recreational facilities

86

and a mutual benefit to be derived therefrom. We think it clear that the decedent was impliedly invited to use the facilities of the lake for fishing and that he went to the lake as an invitee of the city.

■■ When the decedent went within the four walls of the intake area, did he step beyond the bounds of his invitation and convert his status from that of invitee to that of licensee? The original ordinance prohibited fishing in this area. There is no evidence that the decedent had actual knowledge either of this original provision or of the fact that someone had marked through this restrictive provision with a black crayon. If he did know of the original ordinance, he knew that fishing was prohibited there and that his implied invitation to fish did not include that area. In so doing, he would be in a place where he had no right to be. He would be at most a licensee and at worst a trespasser. In either event, he could not recover without proof of willful and wanton misconduct. "The duty owed by one who owns or is in charge of premises to one on such premises as a licensee is the same as the duty owed by him to a trespasser, that is, he has only the duty not to injure the licensee willfully or wantonly." 28 ILP Negligence, ¶ 56, page 50, citing Ellguth v. Blackstone Hotel, Inc., 408 Ill 343, 97 NE2d 290; Marcovitz v. Hergenrether, 302 Ill 162, 134 NE 85; Garner v. Burns Mid-Town, Inc., 346 Ill App 162, 104 NE2d 506; Armster v. American Steel Foundries, 313 Ill App 378, 40 NE2d 575. It is, of course, fundamental that everyone within the city is charged with constructive knowledge of its ordinances. Haas v. Commissioners of Lincoln Park, 339 Ill 491, 498, 171 NE 526. We would further observe that it is a contradiction within itself to imply an invitation on the part of the city to fish in a place prohibited by its own ordinance. The implication of an invitation to fish there dies aborning.

In constructing its lake, the city provided a three-well intake. Two of these wells were completed, capped and surrounded by a high wire mesh fence. A concrete ramp extended in a Southerly direction to the North fence of the enclosure. The fishing tackle of the decedent was found on this ramp near the fence and lying in an East-West direction. Directly to the West of the enclosed structure was the third intake well. The Northeast corner of the intake well and the Northwest corner of the wire enclosure were the same. The ledge of the uncapped well was some 42″ below the ramp. The well was rectangular, 6′9″ by 8′4″ with a concrete ledge 30″ in width furnishing the rectangular border of the well. It was uncapped, the edges were beveled and were some 30″ above water level. The water in the well was some 23′ deep. Witness Bright, who discovered the body in the well, testified that to get down to the concrete ledge which formed the edges of the open intake well:

> "I had to hang on the bar. Then I swung myself down to the landing. It was difficult to get down to the landing even for a man of my age (37 yrs.). There was nothing around the area way to indicate how this man got into this area."

Decedent was 67 years old and "moderately obese." From the evidence, it is clear that decedent could not have fallen into the well had he remained on the ramp. It required physical exertion and some dexterity to reach the concrete ledge. We think that reasonable minds must agree that the construction itself belies any implied invitation to the public to use this ledge. No ready access was furnished to it and no ready exit was provided from it. It seems abundantly clear that the requisites of an implied invitation to the decedent to invade this area are wholly lacking

and he, of his own volition, brought his implied invitation and his status as an invitee to an end.

■ But, appellee asserts an estoppel in pais against the city because of the ordinance copies in which the restrictive provision was marked out. It is horn-book law that an ordinance of a municipality may be repealed, modified, or amended only by municipal action of like dignity. It does not follow from this, however, that officials of a city may not, in a proper case, induce or mislead another to act or fail to act to his detriment and thus trigger the doctrine of estoppel into effective action.

■ In Wehrmeister v. Carlman, 17 Ill App2d 171, 149 NE2d 453, 458, the doctrine is thus stated:

> "In Melin v. Community Consolidated School District No. 76, 1924, 312 Ill 376, at pages 383, 384, 144 NE 13, 16, the Court said:
>
> > "A municipal corporation, when acting in its private, as contradistinguished from its governmental capacity, may be estopped . . . But before the doctrine of estoppel can be invoked there must have been some positive acts by the municipal officers . . . which may have induced the action of the adverse party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had done . . . The doctrine of estoppel in pais applies to the public only to the extent that it leaves the courts to decide the question from all the circumstances of the case, and to hold the public estopped or not, as right and justice may require. The doctrine is applicable only as a means of preventing injustice or fraudulent results. . . ."

■ ■ One of the essential elements of estoppel as applied to municipalities is positive or affirmative acts of the city or its officials. Cases illustrative of the application of this principle one way or another are: City of Quincy v. Sturhahn, 18 Ill2d 604, 165 NE 2d 271; In re Certain Territory of Palos Heights, 30 Ill App2d 336, 174 NE2d 574; Webster v. Toulon Tp. High School District No. 4 et al., 313 Ill 541, 145 NE 118. Assuming without deciding that the facts of the instant case square with that principle, we are then met face to face with a second necessary element. He who invokes estoppel must show that he relied on the acts or conduct of the city or its officials to his detriment. It seems to us fundamental that reliance upon given acts, conduct or circumstances presupposes a knowledge of the existence of those acts, conduct or circumstances. On this issue, the evidentiary record in this case is a total void. We are left to speculate and guess whether the decedent went to the locale of his death because he had read the crayon-marked ordinance, or had heard of it from friends or acquaintances, or had seen others fishing there, or, absent any of these, that he was merely following his fishing know-how in seeking his prey in the deep and cool waters near the intake regardless of whether it was permissible or not. We recognize that death has sealed his lips. He left behind nothing whereby it can be determined whether his reliance was on the conduct of the city, on the conduct of other fishermen, or upon his own self-imposed volition. In this situation, it is pure conjecture to say that his reliance was upon acts, action, or conduct of the defendant city. We thus conclude that there is a total want of proof that decedent was anything but a licensee.

■ ■ The duty of a property owner to a licensee is stated in Kapka v. Urbaszewski, 47 Ill App2d 321, 198 NE2d 569, 572, as follows:

". . . A property owner is under no duty to make the premises safe for a licensee. His only duty is to warn the licensee of concealed defects that are known to the owner and to refrain from injuring him willfully or wantonly. Ciaglo v. Ciaglo, 20 Ill App2d 360, 156 NE2d 376; Jones v. Schmidt, 349 Ill App 336, 110 NE2d 688; 25 ALR2d 598. A licensee goes upon another's property at his own risk and must take the premises as he finds them. Dent v. Great Atlantic & Pacific Tea Co., 4 Ill App2d 500, 124 NE2d 360. . . ."

In her brief, plaintiff characterizes the area as a death trap and says there were dangers not obvious or apparent. Included among these is the depth of the water; the fact that the well was fully enclosed under the ledge by wire mesh on four sides; that the beveled edge of the ledge was 30 inches above the water; that it was some 60 inches from the water level to the outside edge of the ledge; that a pipe along the fenced enclosure down to the ledge was a convenient handrail to get down to the ledge but its distance from the water level precluded its use to get back out, and that there was no ladder or mechanism to use to get out of the well. With the exception of the wire mesh and the depth of the water, all else is clearly visible in the photographs and, ipso facto, visible to and should have been known to the decedent. The depth of the water near the intake should have been obvious. There is nothing to suggest that the wire mesh contributed in any way either to his presence in the water or his drowning. The remaining things were neither defects nor concealed. There was no duty to warn of those things which were there for all to see.

There is nothing in the evidence to indicate that any of the things mentioned caused his fall into the water. We would go far beyond the perimeter of any known cases to impose a duty on the city to warn him

91

that if he did fall in, there was no way to get out. If that fact was known to them, it certainly was not concealed from him. The record shows him to be a good swimmer, a good fisherman and a man of careful habits. The blunt and unfortunate fact is that for some reason not disclosed by the evidence, decedent fell into the water—a mishap which, we submit, neither he nor the city had any reason to foresee.

Since the decedent was only a licensee and there is no appeal from the dismissal of the willful and wanton count, the judgment of the circuit court of Coles County should be and it is hereby reversed.

Reversed.

TRAPP and CRAVEN, JJ., concur.