(No. 6412—Claim )

THOMAS MOONEYHAM, Administrator of the Estate of RONALD SCOTT MOONEYHAM, Deceased, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 19, 1973.*

DREYER, FOOTE & STREET ASSOCIATES, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; MARTIN A. SOLL, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

This is an action brought by Thomas Mooneyham, Administrator for the death of his son, Ronald Scott Mooneyham.

On October 25, 1972, Thomas Mooneyham, his wife, and their son, Ronald Scott Mooneyham, age 12, and several others visited Starved Rock State Park. This was the first occasion that the Mooneyhams and their children had ever been in the park. They arrived in the park about 1:00 p.m., and shortly thereafter, they prepared lunch. Lunch was concluded approximately one hour later and at that time, Ronald, age 12, Allen Tidwell, age 8, Ronald's sister, Lucretia, age 6, and another child in the party, Boyd Potts, asked Mr. and Mrs. Mooneyham if they might walk up to the airplane ride located between the picnic area and Starved Rock.

The airplane ride was in an area visible from the picnic area where the Mooneyhams ate lunch. The children were given permission and, after being warned to be careful, left the picnic area.

After cleaning up the area and loading the car, which was some time later, the Mooneyhams and the other adults in the party started out in the direction in which the children had gone.

They were met along the way by Allen Tidwell, who

came running up to them and told them that Ronald Scott Mooneyham had fallen into the Illinois River, which borders Starved Rock State Park.

It appears from the evidence that instead of going to the airplane ride, the four youngsters had visited the area between Starved Rock and Lover's Leap.

Starved Rock is a State Park consisting of, at the time of this tragedy, approximately 1,500 acres. It is an extremely rugged area in which there are sandstone cliffs, canyons and other natural phenomena, which is the reason for the park's existence. The sandstone bluffs have been eroded by wind and water for centuries, creating a very interesting, but also a very rugged and dangerous, area. It is bordered on the north and west side by the Illinois River. Across the Illinois River, a short distance above the sandstone formation known as Starved Rock, is a dam operated by the United States Corps of Engineers. This dam controls the Starved Rock pool which is of considerable size as it backs the water up several miles to the northeast of the dam. This pool is of considerable width, quite deep, and extends for a distance beyond the northern and eastern limits of the park. The operation of the locks can either retard or accellerate the flow of water which affects both the volume and the speed of the river below the dam.

Below the dam, the current is much swifter than it is above the dam, depending somewhat upon the position of the locks regulating the flow of water from the pool to the river.

This dam was constructed for the purpose of supplying water for the Illinois Waterway which maintains a channel of approximately 9 feet in depth.

Most of the park area is overgrown with trees,

bushes, and various kinds of shrubbery, all interlaced with nature trails throughout the entire area.

Upon entering the park, you find a relatively flat area where the parking lots are located, together with the public toilets and concession stand, as well as a picnic area. East of the picnic area, bordering the south side of the Illinois River, is the formation known as Starved Rock.

A relatively short distance away from Starved Rock, which is a high sandstone bluff with three sides that are very sheer, is a similar formation known as Lover's Leap. Between them is a small beach. All of this area borders the Illinois River, the current of which is very swift in this particular area and particularly swift if there has been a release of a large volume of water from the Starved Rock dam.

To travel from Starved Rock to Lover's Leap, there is a main trail which curves around the bases of the two above named rock formations. Between these two formations is the small beach which is the area in which the accident occurred. It is possible to reach the beach area in question by leaving the main trail and travelling a comparatively short distance through a trail that, though unauthorized, nevertheless was used by numerous visitors.

The park does not maintain a trail to the beach area and, as a matter of fact, there is a fence, as shown by the exhibits, which at least partially blocks the area from the main trail.

Visitors, with their usual disregard for signs which have been put up in an effort to direct their travel in the park, have avoided the fence and have made it easy to go to the Beach area.

It also appears from the record that the main trails are marked with yellow dots for going and with white dots for returning.

The park is interlaced with many trails and there is evidence that there are numerous signs that read "Danger—Stay on Main Trail."

On the beach itself, there are two signs—one saying "No Swimming or Wading" and the other "Dangerous Undertow."

Despite this fact, according to the Park Rangers who testified, people still frequent the beach area and other areas of the park to which there are no authorized trails.

The record indicates that approximately 500,000 to 600,000 people visit the park annually for the purpose of viewing the works of nature. The entire area, due to the ruggedness, has proved very attractive to the visitors despite the apparent dangers that, of necessity, exist in an area as wild and rugged as a natural park.

It appears from the record that all four children had left the marked trails and gone to a small cove on which there was a beach. This area is located between Starved Rock itself and a similar rock formation known as Lover's Leap and is directly on the Illinois River, a relatively short distance below the dam. Lover's Leap is a rock formation that borders directly on the river and is of considerable height with a sheer cliff on the river's side.

After playing around in the sand for some time, Ronald Scott Mooneyham and Allen Tidwell climbed up on the Lover's Leap formation. After they climbed part-way around the rock, Ronald fell in. Allen Tidwell ran back to his uncle and informed him of what had happened.

Exhibits, by pictures, show the area in which the climbing was done.

Michael Butler, a young man, was informed by Allen Tidwell of what had happened and this individual went to the scene where the young boy had fallen in.

He stated he could hear the boy but could not see him at that time because of the fact that the river had eroded the bottom of Lover's Leap formation. Mr. Butler finally saw the boy and reached down to him with a long stick but the boy in the water was unable to grasp it. Butler then jumped in and was swiftly swept downstream because of the undertow. He surfaced approximately 30 feet from the point where he went in. By that time, the boy had gone under and was out of sight of Mr. Butler. Mr. Butler then got into a boat that people who were on the river had brought over after having seen the difficulty.

Mr. Butler stated that he was a good swimmer and that he had taken off some of his clothing, including his shoes, before he went into the river, but the river at that point was flowing very swiftly and it was a very difficult place in which to swim.

Claimant, in his Brief, advanced the theory that the death of Ronald Scott Mooneyham was caused by the failure of the State of Illinois to exercise reasonable care and maintenance to keep Starved Rock State Park in a safe condition. In support of this theory, his contention is that the State of Illinois had actual notice that a dangerous area existed in Starved Rock State Park.

Claimant offered some 14 exhibits dealing with accidents in the park area. These exhibits dated from 1965 to 1971.

Three of these exhibits dealt with the Starved Rock formation and the rest dealt with either the Lover's Leap formation or the river and cove area. Some of these exhibits were admitted by the Commissioner and some were not. Several of them dealt with situations greatly similar to the present case where individuals, in complete disregard of the warning signs, attempted to climb Lover's Leap formation and suffered various sources of injuries, some of them falling into the river and others merely falling onto the beach and sustaining injuries in that fashion. Some were caused by individuals ignoring the "No Swimming" signs and going into the water.

It is rather interesting to note that these accidents involving Lover's Leap and the cove area, 11 in all, covered a period of 6 years, in which period of time there would have been approximately 3 million visitors to the park.

It is the contention of the claimant that these accidents were sufficient notice to the State that a dangerous area existed and that the State failed to exercise reasonable care in maintaining the park in a safe condition and that insufficient warning was given that dangerous conditions existed in the park.

It is also the contention of the claimant that this area should have been completely fenced off to prevent entrance, that decedent exercised due care for his own safety, and further that the parents were not guilty of contributory negligence, and that the law presumes that the wrongful death of a minor child results in pecuniary loss.

Numerous cases were cited in support of each position taken by the claimant.

The respondent, in its Brief, takes the position that

(1) Respondent is free from negligence because the State, not being an insurer of safety, has completely discharged its duty to the public in exercising reasonable care in the maintenance and supervision of Starved Rock State Park;

(2) Respondent is free from negligence, because the State of Illinois, not being an insurer of safety, has no duty to warn the public of an obvious danger existing off the trial of a State Park;

(3) The proximate cause of this accident was decedent's intentional departure from the trail;

(4) Claimant has failed to sustain his burden of establishing by a preponderance of the evidence that decedent was in the exercise of due care for his own safety;

(5) Claimant's decedent assumed the risk of injury by voluntarily exposing himself to a place of obvious danger; and

(6) Claimant is not entitled to damages.

The question then resolves itself as to whether or not an award can be made when a young child loses his life under the circumstances above described.

The State has argued that the decedent was not in the exercise of due care for his own safety. The record discloses that the unfortunate victim was a lad of better than ordinary in elligence and ability, his school record was good, and that he was normal or above normal in every respect intellectually.

This Court has previously held that the State of Illinois, in maintaining a nature park, is not obligated to warn of every dangerous place in it.

In the HANDBOOK OF ILLINOIS EVIDENCE, Page 90, a statement is made as follows: "However, on the question whether the evidence is admissible to prove the dangerous nature of the situation itself, considerable uncertainty is found." There are cases cited both for and against the admission of such evidence and Wigmore takes the position that the evidence of previous accidents to prove the notice of a dangerous condition should be admitted.

In the case of *Hansen* vs. *State of Illinois*, 24 CCR, Page 102, the accident was caused when the individual injured stepped off the beaten path for a very short distance. The dirt path crumbled and the individual fell. There was not any notice or warning sign. The Court, in passing upon this situation, made the following statement: "Obviously the State, in maintaining a nature park, is not obligated to warn of every dangerous place within it. It is, however, obligated to warn of a danger that exists along a trail, which it knows is being used by the public, who would have no knowledge of the existing danger."

In the case of *Murray* vs. *State of Illinois*, 24 CCR, Page 399, claimant fell into a hole approximately three feet from the path. There was no warning sign and the danger was hidden. There was knowledge by the State that such conditions existed and there was no way that the general public would have knowledge of the area in question.

In the case of *Stedman* vs. *State*, 22 CCR, Page 446, the accident happened at Starved Rock. In this case, the claimant left the path, moved to the edge of the canyon and fell. Negligence was charged by the failure to erect signs and guard rails and in failing to provide lighting. The path was fifteen feet from the place of the fall. On Page 449 in said case, the Court made the following observation: "To require the maintenance of signs, rails and lights along the many miles of pathways would place a burden upon respondent, which no reasonable man would require." Also, in the same case, same page, "Adult patrons of Starved Rock Park certainly know the character of the park's terrain, and respondent is entitled to take that into consideration in determining when,

where and how safeguards and warning should be installed."

In this case, the Court held that it was not the lack of guard rails, signs, etc. that was the cause of the accident but the intentional departure from the path by the claimant in the night time.

The Court further stated that to hold otherwise would place an unwarranted burden approaching that of an insurer upon the State of Illinois, and would, in effect, ignore the requirement that a claimant must, in order to recover, be in the exercise of due care and caution for his own safety.

In the case of *Finn* vs. *State of Illinois*, 24 CCR, Page 177, in passing upon a claim where an individual claimed to have injured himself by stepping into a depressed area, the Court made the following statement: "It is our opinion that the State cannot be held responsible for every depressed area or hole into which someone might step and turn their ankle, or otherwise injure themselves throughout the State Parks. To require constant inspection in a park of some size, where the State maintains several thousand acres for the benefit of the public, would place an undue hardship and extraordinary burden on the State, by and through its agents and servants."

While it is true that respondent is under the duty to exercise reasonable care in maintaining its parks, it is likewise the law that respondent is not an insurer against accidents occurring to patrons while using the park facilities. *Kamin* vs. *State of Illinois*, 21 CCR, Page 467.

The Court, in its many cases involving similar situations in the park systems of the State of Illinois, has

made a distinction of the dangers that are obvious and those that are hidden or man-made. The Court has uniformly held that where the dangers are manmade or hidden and are not obvious to the public, the State is usually liable.

The Court has also held that where the danger is not one created by man or the park system but one created by nature and is obvious, the State is not responsible.

Volume 33A of Illinois Law & Practice — Section 114 — Injury in State Parks — makes the following statement.

"With respect to liability in tort under the Court of Claims Act the State owes a duty to the public to exercise reasonable care in establishing, maintaining and supervising its parks, and it has a duty to warn of a danger that exists along a nature trail which could not be discovered by the public." Citing 24 Ill.Ct.Cl. 1 *Martin* vs. *State.*

On the other hand, I.L. & P. states that the State is not obligated to warn of every dangerous place in a park as, it points out, the invitation to use the parks is not absolute but an invitation to use particular facilities in the manner in which, and for the purpose for which, they were designed and intended. Citing *Pulizzano* vs. *State,* 22 Ill. Ct. Cl. 234.

In the instant case, the State had knowledge of the short cut path used by Ronald to the cove and had knowledge of the use of this path by others for quite some time. It also had knowledge that numerous people visited the beach between Starved Rock and Lover's Leap.

It can thus be convincingly reasoned that, having taken no precautions against visitors using the short cut to the cove, nor against visitors making use of the cove, that there was an implied invitation extended to make use of this unauthorized path and cove area.

However, the question remains, notwithstanding the negligence of the State, whether such negligence was the proximate cause of the accident which followed.

Proximate cause is defined as that cause which, in natural or probable sequence, produced the injury complained of. See IPI Sec. 15.01 at page 93.

Implied permission to use the beach and to make use of the short cut path does not carry with it implied permission to climb the rock formation which this young lad did. See *DuMond* vs. *City of Mattoon*, 60 Ill.App.2d, 83, 207 N.E. 2d 320.

In climbing the rock formation Ronald did so without the express or implied knowledge or permission of the State.

Negligence, if any, of the State in permitting persons to visit the cove cannot be extended to cover injuries received by someone who goes beyond this implied invitation. There was no proximate cause between what the State failed to do and the injuries sustained in the present case. Had the drowning occurred in a manner attributable solely to the use of the beach, the result could have very easily been different.

It is this Court's opinion that all unauthorized trails to the cove, including the one used by this lad, should have been restricted in a reasonable manner, but the State's failure to do so was not the proximate cause of the accident.

It is the opinion of this Court that the natural dangers existing in said park that caused the unfortunate tragedy, and particularly the steepness of the cliff and the swiftness of the Illinois River, are certainly obvious dangers and, with the exception of the dam, were

not man-made. Clearly a river such as the Illinois River is an obvious danger and one that is not under the control of the State. The cliff upon which the victim was climbing was one created by nature and is one of the reasons that the park exists, and while it is undoubtedly true that cliffs of this nature are a challenge to young people and adults, that does not create a liability on the part of the State since it is an obvious danger and one that is assumed by visitors to the park. To make the park completely safe for every visitor, regardless of age, would result in the absolute closing of the park or confine visitors to a fenced-in area which would undoubtedly cause the park to lose its present attraction.

It is the opinion of the Court that the tragedy that occurred was not the proximate result of any negligence on the part of the State in maintaining its park.

The Court holds, therefore, that this claim is hereby denied.