**Scott DAVIS, Plaintiff-Cross-Appellee, Cross-Appellant,**

v.

**UNITED STATES of America, Defendant-Cross-Appellant, Cross-Appellee.**

Nos. 82–2604, 82–2649.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1983.

Decided Aug. 18, 1983.

Rehearing and Motion To Certify State Law Question Denied Oct. 7, 1983.

Nancy K. Needles, Asst. U.S. Atty., Chicago, Ill., for defendant-cross-appellant, cross-appellee.

Robert B. Patterson, Drumke & Patterson, Louis G. Davidson, Chicago, Ill., for plaintiff-cross-appellee, cross-appellant.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Scott Davis was injured in September 1978 while diving into Devil's Kitchen Lake in the Crab Orchard National Wildlife Refuge. The Refuge is owned and operated by the United States, and is heavily patronized—it had one and a half million visitors in 1978—especially by students at the nearby campus of Southern Illinois University (SIU). In the nine years preceding the accident there had been five diving accidents at another lake in the Refuge, Crab Orchard Lake. One of the accidents had been fatal; two others had rendered their victims quadriplegics. Knowing there was swimming in Devil's Kitchen Lake too and fearing lest the subsurface rocks in the lake cause serious diving injuries such as had occurred at Crab Orchard Lake, the government in 1975 had closed Devil's Kitchen Lake to swimming except at a beach at one end of the lake, and had posted along the Refuge's roads leading to the lake, near the entrances to the Refuge, signs of moderate size reading, "No Swimming in Devil's Kitchen Lake." Beneath each sign had been erected a slightly smaller one reading, "No Diving." Neither the size nor the color

of the signs (white on blue) indicated danger, and there was no reference to the subsurface rocks or to any other possible hazard to a swimmer or diver—or, for that matter, to the fact that swimming *was* permitted at the beach. At first no effort was made to enforce the prohibition, but in 1976 the rangers who patrol Crab Orchard Refuge began issuing citations, accompanied by oral explanations of the danger, to people caught swimming in the lake. The government also made an effort to publicize the prohibition with local radio spots and notices in the SIU campus newspaper.

It was against this background that Davis, a 23-year-old student at SIU, went with three friends to swim in Devil's Kitchen Lake one summer afternoon. One of the young men, Ellison, had swum in Devil's Kitchen Lake before and had not noticed any hazardous rocks. As the group drove into Crab Orchard Refuge, Davis was seated on the left-hand side of the rear seat of the car and did not see the no-swimming and no-diving signs. One of the young men asked Ellison whether it was okay to swim in Devil's Kitchen Lake and he replied, "you're not supposed to but everyone does." Davis testified that he did not hear this exchange. The group parked in a gravel "widened spot" and walked to the shore. There was no one in the water and no indication that it was an authorized swimming area. Ellison inflated a rubber raft and floated out on it. Davis and another young man swam about for a short time without incident and then got out and walked some feet to a point on the shore opposite Ellison on his raft. The shore here was a stone ledge about three feet above the surface of the lake. The lake seemed clear to Davis, but he also testified, "There was glare from the sun. So that if you looked down at the water the sun was reflected into your eyes." Davis and his companion decided to swim out to Ellison and tip him into the water from his raft. They took running dives and while in the air Davis dropped his arms to his side. He landed head first on a rock outcropping that protruded from the bottom of the lake to a point about a foot and a half below the surface, and broke his neck. His companion struck the same outcropping but just scraped his chest.

The accident rendered Davis a quadriplegic. He brought this suit for damages against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* The district court determined his damages to be $4,047,000, and the amount is not contested. The district court also determined that the accident was due 75 percent to Davis's own negligence and 25 percent to that of the United States, and therefore awarded him $1,012,000. He has appealed, contending that he is entitled to his full damages or at least to more than 25 percent; the government has cross-appealed, contesting liability.

We think it clear to begin with that under Illinois law (which governs the substantive issues in this case, see 28 U.S.C. § 1346(b), because the accident occurred in Illinois) the government was at least negligent in failing to warn the public of the danger of subsurface rocks more effectively than it did. The danger was not obvious, as in our recent decision in *Kohl v. United States,* 712 F.2d 286, 290 n. 1 (7th Cir.1983). From the photographs in the record Devil's Kitchen Lake, despite its faintly ominous name, presents a placid, unthreatening appearance. Although the shoreline is rocky, the lake looks deep and there is no indication that there might be sinister stilettoes jutting up from its bottom. Even to one swimming in the lake there is no suggestion of danger, for Davis and his companion swam about, and Ellison floated about on his rubber raft, for some minutes—how long is unclear—without noticing any subsurface rocks. The "No Swimming" sign was not much good as a warning of danger; the prohibition it laconically announced could just as well have been intended to protect the lake from swimmers as vice versa. The "No Diving" sign was a little better—for what could be its purpose but to warn of danger?—but still left too much to the imagination. For rangers to give oral warnings to people they caught swimming or diving was fine as far as it went, but did

Davis no good, for no ranger saw these young men swimming; nor had they gotten the message by word of mouth from fellow students who had been caught, or from the occasional radio spots or occasional notices in the campus newspaper.

The history of diving accidents at Crab Orchard Lake showed that people were diving despite the prohibition against swimming and diving and were getting seriously hurt doing so; and the government was aware of unauthorized swimming, and similar danger, at Devil's Kitchen Lake. It would not have cost much to amend the "No Diving" sign to add "Danger: Subsurface Rocks," and to have posted these signs where swimmers could be expected, such as at the gravel widened spot where Davis and his friends parked their car, as well as at the entrances to the Refuge. Of course the cheapness of a precaution is not the only consideration in deciding whether its omission is negligent; the benefit from the precaution must be commensurate. See *Lance v. Senior,* 36 Ill.2d 516, 224 N.E.2d 231 (1967); *Bezark v. Kostner Manor, Inc.,* 29 Ill.App.2d 106, 111, 172 N.E.2d 424, 426–27 (1961); *Albers v. Church of the Nazarene,* 698 F.2d 852, 857 (7th Cir.1983). In this case it would have been. In view of the gravity of diving accidents, their incidence at the nearby Crab Orchard Lake, and the possibility, well illustrated by this case, that swimmers might simply be oblivious to the danger of subsurface rocks—especially since the refraction of light in water can cause a person to misjudge depth—signs such as we have described might well have been highly beneficial. If they had been posted and had prevented this accident, their benefits would have been measured in the millions of dollars and their costs in the thousands or less. Even if such signs would have reduced the probability of the accident by only one percent, they would have been a bargain in an expected-value sense, for one percent of $4 million is $40,000, which must be much more than what the signs would have cost to buy, install, and maintain. And this understates the benefits of the signs, since other potential accident victims, not just Davis, would have been warned.

But under the common law of Illinois it is not a tort negligently to injure a trespasser. *Trout v. Bank of Belleville,* 36 Ill.App.3d 83, 86, 343 N.E.2d 261, 268 (1976); *Votava v. Material Service Corp.,* 74 Ill. App.3d 208, 212, 30 Ill.Dec. 113, 116, 392 N.E.2d 768, 771 (1979). While the district court found that Davis was not a trespasser when he was injured, the court did not explain its finding; and we think Davis was a trespasser as a matter of law. The fact that he may not have known he was a trespasser is irrelevant (it is unclear whether he knew, since the district court made no finding on whether, despite his denial, Davis had heard Ellison acknowledge that swimming was forbidden). See *DuMond v. City of Mattoon,* 60 Ill.App.2d 83, 87, 207 N.E.2d 320, 322 (1965) ("The original ordinance prohibited fishing in this area . . . . It is, of course, fundamental that everyone within the city is charged with constructive knowledge of its ordinances. . . . The implication of an invitation to fish there dies aborning"); *McAllister v. Jung,* 112 Ill.App. 138, 147 (1904) (dictum); Prosser, Handbook of the Law of Torts 74 (4th ed. 1971). Although the signs the government posted may not have been very good as warning signs, they were unequivocally prohibitory, and thus prevent Davis (whether or not he saw them) from claiming the status of an implied invitee under *Beccue v. Rockford Park Dist.,* 94 Ill.App.2d 179, 187–88, 236 N.E.2d 105, 109 (1968), a case where no signs had been posted prohibiting entry to the area where the injury occurred. An invitee loses his status and becomes a trespasser "by going to a portion of the premises to which the invitation does not extend." *Avery v. Moews Seed Corn Co.,* 131 Ill. App.2d 842, 845, 268 N.E.2d 561, 564 (1971); see also *DuMond v. City of Mattoon,* 60 Ill.App.2d 83, 207 N.E.2d 320 (1965); *Pulizzanno v. State,* 22 Ill.Ct.Cl. 234, 244 (1954); *Mooneyham v. State,* 29 Ill.Ct.Cl. 144, 154 (1973).

It is possible that circumstances suggesting an implied invitation might override the signs, and even that a land-

owner's failure to take any steps to prevent invitees from straying to the forbidden zone might be enough to constitute an implied invitation. See *Mooneyham v. State, supra,* 29 Ill.Ct.Cl. at 154. But while the government here could have done more to prevent people from swimming and diving, we cannot say it did nothing, or that the lake itself constituted an invitation to swim and dive at a place where there was no beach or other facility provided for swimming or diving.

The rule that there is no duty of ordinary care to a trespasser is, however, closely allied to another common law rule—that contributory negligence is a complete defense to a charge of negligence. In both cases the victim could have prevented the accident at reasonable cost—the trespassing victim by not trespassing, the contributorily negligent victim by using due care for his own safety—and this is enough in common law thinking to excuse the defendant from any liability. Illinois recently abrogated contributory negligence as a defense and substituted comparative negligence. *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981). (*Alvis* declared that comparative negligence would be the rule in all trials that began after June 8, 1981, as the trial in this case did. 85 Ill.2d at 28, 52 Ill.Dec. at 35, 421 N.E.2d at 898. Since the effective date of the rule determines substantive rights, it is applicable to cases under the Tort Claims Act. See 28 U.S.C. § 1346(b).) It would be rather inconsistent for Illinois to retain the status of trespasser as a complete defense rather than to make it just one factor in the comparison of fault.

This is conjecture, though, and there is a solider ground for thinking that the Illinois courts would not apply the rule that there is no duty of care to a trespasser in this case. Although at one time the only duty of a landowner to a trespasser was not to set traps for him, see, e.g., *Bush v. Brainard,* 1 Cow. 78 (N.Y.Sup.Ct.1823), the modern common law of Illinois makes the landowner liable for a "willful and wanton" injury to a trespasser. See, e.g., *Mentesana v. LaFranco,* 73 Ill.App.3d 204, 29 Ill.Dec.

153, 391 N.E.2d 416 (1979). True, some of the Illinois cases where injury to a trespasser has been deemed "willful and wanton" involve "active negligence," see, e.g., *Hill v. Baltimore & O.R.R.,* 153 F.2d 91, 93–94 (7th Cir.1946); *Wrigley v. Electric & Machine Co.,* 419 F.2d 972, 975 (7th Cir.1969), which requires more than just failing to warn of a hazard. And others define "willful and wanton" as serious misconduct. See, e.g., *Schneiderman v. Interstate Transit Lines, Inc.,* 394 Ill. 569, 583, 69 N.E.2d 293, 300 (1946) ("a reckless disregard for the safety of others"); *Murphy v. Jewel Cos.,* 24 Ill. App.3d 1, 4, 320 N.E.2d 47, 50 (1974) ("it goes far beyond mere inadvertence such as we find in the case of ordinary negligence, for it requires a conscious disregard for the safety of others"). More, though, find only a shade of difference between willfulness and wantonness on the one hand and negligence on the other. See, e.g., *Cooper v. Cox,* 31 Ill.App.2d 51, 56, 175 N.E.2d 651, 653 (1961); *Spivak v. Hara,* 69 Ill.App.2d 22, 26, 216 N.E.2d 173, 175 (1966) (describing willfulness and wantonness as "a vague and somewhat shadowy area close to ordinary negligence"); *Beverly Bank v. Penn Central Co.,* 21 Ill.App.3d 77, 82, 315 N.E.2d 110, 115 (1974) ("It is sufficient if he [the landowner] had notice which would alert a reasonable man that substantial danger was involved and that he failed to take reasonable precautions under the circumstances"); *Spence v. Commonwealth Edison Co.,* 34 Ill.App.3d 1059, 1067, 340 N.E.2d 550, 556 (1975); *Tripp v. Hale,* 74 Ill.App.3d 200, 30 Ill.Dec. 93, 392 N.E.2d 748 (1979).

In *Latimer v. Latimer,* 66 Ill.App.3d 685, 688–89, 23 Ill.Dec. 471, 473, 384 N.E.2d 107, 109 (1978), the Illinois Appellate Court used as the test of willful and wanton the formulation in the Restatement (Second) of Torts § 342 (1965) of the landowner's duty of care toward licensees. This formulation makes the landowner liable for an injury caused by a condition on the land if he "knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or

realize the danger, and ... he fails ... to warn the licensees of the condition and the risk involved...." This describes our case perfectly (see *id.,* comment j, on the effect of posting signs that do not warn of danger); and though the draftsmen intended the language to apply to licensees, the *Latimer* case equated it to the common law term "willful and wanton" which under Illinois law defines the landowner's duty of care to trespassers as well.

In addition, section 335 of the Restatement states: "A possessor of land who knows ... that trespassers constantly intrude upon a limited area of his land, is subject to liability for bodily harm caused to them by [a highly dangerous] artificial condition on the land, if ... the condition ... is of such a nature that he has reason to believe that such trespassers will not discover it, and ... [he] has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved." The director of the Crab Orchard Refuge had described Devil's Kitchen Lake before the accident as "a man-made impoundment creating a hazardous environment for swimming and diving," and we would add only that it was very hazardous. Altering nature in this fashion created an artificial condition, see cases cited in Prosser, *supra,* at 355 n. 45; the government was well aware that "trespassers constantly intrude ..."; yet it failed to take reasonable care to warn trespassers of the risk. Although we have found no Illinois case that cites section 335 of the Restatement, the fact that the Illinois Appellate Court in *Latimer* used section 342 to define "willful and wanton" suggests that Illinois courts would, *a fortiori,* insist that landowners come up to the less demanding (because limited to conditions that are both artificial and *highly* dangerous) standard of care in section 335.

 The district judge found, however, that the government was not "willful and wanton" in this case. He said, "I think, first of all, 'wilfulness' means doing something intentionally that you know should not be done thereby constituting a misconduct. It implies, at least, an exercise of a

will. 'Wantonness' implies a complete disregard for the rights or the safety of others." Although there is some support for this formulation in the Illinois cases, we think Illinois courts today would be more likely to apply the tests of sections 335 or 342 of the Restatement; and although we could remand the case for a determination of the government's liability under either of these tests, we are sufficiently confident that any reasonable trier of fact would find the government in this case willful and wanton to be unwilling to prolong the litigation. We understand and share the district judge's reluctance to find the government guilty of serious misconduct; the facts, as shall appear, do not support such a finding. Where we disagree with the district judge is over the meaning of "willful and wanton." In Illinois law, these terms do not have their usual English meaning; they merely denote a somewhat heightened form of negligence such as the government was guilty of here.

 The next question is whether the government's liability for its willful and wanton injury was excused by Illinois' Recreational Use of Land and Water Areas Act, Ill.Rev.Stat.1981, ch. 70, ¶¶ 31–37. The Act is intended to "encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." ¶ 31. To this end, it provides that a landowner who opens his land for public recreation "owes no duty of care to keep the premises safe for entry or use by any person for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes," ¶ 33, except a duty to avoid a "willful or malicious failure to guard or warn against a dangerous condition," ¶ 36(a). If "willful or malicious" does not denote a higher degree of wrongdoing than "willful and wanton," the government's Use Act argument fails at the threshold. But we think it does. We derive some support from cases construing similar statutes in other states, see *Gard v.*

*United States,* 420 F.Supp. 300, 302 (N.D. Cal.1976), aff'd, 594 F.2d 1230 (9th Cir.1979) (per curiam); *Ducey v. United States,* 523 F.Supp. 225, 230 (D.Nev.1981); but see *Mandel v. United States,* 545 F.Supp. 907, 912–13 (W.D.Ark.1982), and more from the fact that, given the structure of Illinois tort law, if "willful or malicious" meant no more than "willful and wanton" the Use Act would provide no protection at all against tort liability. Under the common law of Illinois, if a landowner permits but does not invite the public to use his land for recreational purposes—which is all the Use Act appears to contemplate since its limitation of liability is inapplicable if a fee is charged users, Ill.Rev.Stat.1981, ch. 70, ¶ 36(b)—the users are licensees, see Restatement (Second) of Torts §§ 330, 332 comment d (1965); and under Illinois law, the landowner's duty of care to a licensee is the same as his duty of care to a trespasser—to avoid willful or wanton injury. E.g., *DuMond v. City of Mattoon, supra,* 60 Ill.App.2d at 87, 207 N.E.2d at 322; *Latimer v. Latimer, supra,* 66 Ill.App.3d at 688–89, 23 Ill.Dec. at 473, 384 N.E.2d at 109. So if the Use Act merely confined the landowner's liability to willful or wanton injuries, it would be codifying rather than modifying his common law liability, and that could not have been the legislators' intent.

■ The government's failure to warn here was not "willful or malicious." It knew there was a hidden hazard, but did not just sit on its hands. It took steps to prevent the type of accident that occurred here, and just failed to take additional precautions that also would have been cost-justified—yet would not have been of certain efficacy. Many people would pay little attention to a sign that said "Danger: Subsurface Rocks." They would think that if they stared hard at the water they would see the rocks; and if like Davis and his friends they had swum around for a bit before diving, they might decide that the sign referred to another part of the lake, or was just another manifestation of what they might consider the nanny spirit of modern government. So while such signs would be cheap and the accidents they

would avert if effective are horrendous, we cannot call the government's failure to put up explicit warning signs in addition to the signs and other precautions that it did employ willful or malicious.

■ Therefore, if the Use Act applies to Crab Orchard Refuge, the government's misconduct toward Davis is excused. The plaintiff concedes that if the Refuge were privately owned, its owner would be within the literal scope of the Use Act; and under the Federal Tort Claims Act the government is liable only "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. But in *Miller v. United States,* 597 F.2d 614, 616 (7th Cir.1979), we held the Use Act inapplicable to Crab Orchard Refuge because of a subsequent Illinois statute, the Recreational Area Licensing Act, Ill.Rev. Stat.1981, ch. 111½, ¶¶ 761–785. That Act, on the basis of a finding "that there exists, and may in the future exist, within the State of Illinois recreational areas . . . which are substandard in important features of safety, cleanliness, or sanitation," declares its purpose to be "to protect, promote, and preserve the public health, safety and general welfare by providing the establishment and enforcement of minimum standards for safety, cleanliness and general sanitation for all recreational areas . . . ." ¶ 763. The Act defines "recreational area" as an area where cabins or other overnight facilities such as campgrounds are maintained for recreational activities (broadly defined in ¶ 762(b) to include but not be limited to swimming) or for camping, ¶ 762(a). The government concedes that if Crab Orchard Refuge were privately owned (the Act does not apply to federal land, 81 Ops.Ill.Atty.Gen'l No. 016) it would be subject to the Act because it has campgrounds.

■ The government asks us to reconsider our holding in *Miller* that landowners subject to the Licensing Act may no longer claim immunity from tort liability under the Use Act. It points out, first, that the Illinois Appellate Court later rejected this

holding in a dictum in *Johnson v. Stryker Corp.,* 70 Ill.App.3d 717, 721, 26 Ill.Dec. 931, 933, 388 N.E.2d 932, 934 (1979) ("we cannot adopt the restrictive holding of *Miller,*" i.e., that the Use Act does not apply to property subject to the later-enacted Licensing Act). But this is only slight evidence of what the Illinois courts would do if faced with the issues raised by *Miller* and the present case. Not only was the issue not involved in *Johnson* (the landowner there was not subject to the Licensing Act) but the entire dictum is a brief and conclusional subordinate clause, the meat of which we have quoted.

The government points out next that the two acts are not literally inconsistent, which is true but ignores their purposes. The Use Act, passed in 1965, was designed to encourage landowners to open up their property for free public recreation. By 1971, when the Licensing Act was passed, the state had become concerned about safety and health at recreational areas, whether or not operated on a user-fee basis, that contained facilities for overnight stays. The Licensing Act brought these areas under a detailed scheme of licensing requirements and other regulatory controls. The government argues that the legislators' only real concern was with sanitation, but this is belied by the statutory language quoted earlier, which repeatedly describes safety and sanitation as alternative concerns. See also Ill.Rev.Stat.1981, ch. 111½, ¶ 781 (Licensing Act). It would be odd if, having brought under the strict safety and health requirements of the Licensing Act a subset of the landowners who had been encouraged by the earlier Use Act to open their land to public recreation, the state wanted these landowners to continue to enjoy the almost complete immunity from tort liability conferred by that act. This would mean that until the state got around to issuing regulations under the Licensing Act covering swimming and diving in unauthorized areas (which it has not yet done), the owner of a recreational area would enjoy immunity under the Use Act from liability for his negligence while being governed by the safety regulations of the Licensing Act at his swimming beach. Since the Licensing Act contains no provisions relating to tort liability at all, it may reflect a preference for a regulatory over a common law system for preventing accidents in recreational areas. But we imagine that its overriding concern is safety, and so conceived the Act would be undermined if landowners subject to it continued to enjoy the tort immunity of the Use Act with its very different purpose of encouraging the opening of land for public recreation free of charge but at the price of some danger to the public. Also, the Licensing Act bespeaks concern for recreational areas where the landowner, whether or not for profit, has taken steps to encourage recreational uses by providing overnight facilities; and the fact that he has done so suggests he has the resources to protect users from safety hazards.

■ If the spirit of a later statute may be allowed to limit the scope of an earlier one, as cases such as *Erlenbaugh v. United States,* 409 U.S. 239, 243–44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), indicate is sometimes possible despite the hoary canon of statutory construction that repeals by implication are disfavored, our holding in *Miller* that the later Licensing Act limits the scope of the Use Act may well be a correct prediction of how the Illinois courts will try to reconcile the two statutes. This is not certain; but faced with a statutory construction problem of classic indeterminacy, we shall adhere to *Miller. Stare decisis* has its claims.

■ We turn to the question of Davis's own negligence. To dive into water head-first is to court disaster unless you know that, where you hit, the water has sufficient depth to absorb the dive. The truly cautious confine their diving to the deep ends of swimming pools, the piers or jetties of lakes that are marked as safe for diving, and the sides of boats far from shore. To dive from the shore of a lake that has not been marked as safe for diving is negligence per se unless the diver has taken careful soundings of the depth of the lake at the point where he will hit the water, which Davis had not done. True, he

had swum in the lake without noticing any subsurface rocks but that was at some distance from where he dove. The fact that his friends had not noticed subsurface rocks was only slight evidence that there were none in the place where he was diving. His ability to gauge the depth of the lake at the point into which he was diving was obscured by the glare of the sun. A reasonable man would not have dived.

■ So we agree with the district court that Davis was negligent, but must next decide whether his negligence can be compared with the willful and wanton misconduct of the government. At common law, where contributory negligence was a complete defense but only to negligence, a finding that the defendant was guilty of willful and wanton misconduct overrode the plaintiff's contributory negligence and allowed him to collect his full damages. See, e.g., *Iverson v. Iverson,* 56 Ill.App.3d 297, 303, 13 Ill.Dec. 108, 114, 370 N.E.2d 1135, 1141 (1977). Since there was no apportionment of damages at common law, the only choice in such a case was between giving the plaintiff nothing and giving him everything. But with the replacement of contributory by comparative negligence, the reason for shifting the entire liability back to the willful and wanton defendant disappears. This is especially true in a case such as this where willful and wanton is a term of art denoting merely a higher degree of negligence. The function of comparative negligence is to compare different degrees of negligence.

■ Therefore, although the Illinois courts have yet to decide whether a defendant's willful and wanton misconduct may be compared with the plaintiff's contributory negligence, we think it likely that when the issue arises they will align themselves with the majority of comparative-negligence jurisdictions, which hold that it may. See, e.g., *Plyler v. Wheaton Van Lines,* 640 F.2d 1091 (9th Cir.1981); *Bielski v. Schulze,* 16 Wis.2d 1, 15–18, 114 N.W.2d 105, 112–13 (1962); Schwartz, Comparative Negligence § 5.3 (1974); Kionka, *Comparative Negligence Comes to Illinois,* 70 Ill.Bar.J. 16, 20 (Sept.

1981). And even if Illinois adopts the minority position, we cannot imagine that it will refuse to compare the parties' degrees of wrongdoing in a case where both parties' negligence, not just the defendant's, can be described as willful and wanton (cf. Schwartz, *supra,* at 111)—which is, as we shall see, the case here.

■ We have now to consider whether a reasonable trier of fact could have found Davis to be three times as blameworthy as the government (75 percent versus 25 percent). The exact meaning of such a finding is none too clear, and the cases from other jurisdictions (comparative negligence is too recent in Illinois for the Illinois courts to have formulated guidelines for its application) are unhelpful in clarifying it; comparative-negligence judgments are left largely to the intuition of the triers of fact. See Schwartz, *supra,* chs. 17–18. But at its root may be some such idea as the following: though both parties to the accident, injurer and victim, could have avoided the accident at reasonable cost—for otherwise both would not have been negligent and the need to compare their negligence would not arise—one of them could have avoided the accident at a lower cost than the other, and he should bear a larger share of the burden of having failed to do so. Cf. Schwartz, *supra,* at 278 and n. 10. So if the expected cost of the accident is $10 and the plaintiff could have avoided it at a cost of $1 and the defendant at a cost of $2, the plaintiff, being twice as blameworthy as the defendant, should bear twice the cost of the accident as the defendant, which means that his damages should be reduced by two-thirds.

The government could have prevented this accident (if at all) only by erecting signs warning of the danger of subsurface rocks, or by stepping up patrols of its rangers, and neither form of prevention would have been of certain efficacy. But to stop with this observation would be to let the government off the hook too easily. As the signs and increased ranger patrols would not have benefited just Davis but all potential victims of swimming and diving accidents, the cost to the government of pre-

venting the accident to Davis would have been much less than the total costs of those measures. The government also had more information than Davis about the hazards of diving into Devil's Kitchen Lake.

But Davis's own fault was grave. He could have prevented the accident by just not diving. This would have been a trivial sacrifice. He still could have swum out to tip Ellison off the raft; it would just have taken him a few seconds longer. If he derived particular pleasure from diving, he could have pursued the sport in areas marked safe for diving; but it appears he dove just to get to the raft faster. Furthermore, had he not insisted on taking a running dive—and from a ledge three feet above the surface of the water—the danger would have been less. By running and diving from a height he made it certain that he would dive into a part of the lake the depth of which he could not gauge from his position on the shore. (Oddly, the record contains no evidence of the distance between the point from which he jumped and the rock outcropping on which he landed.) Finally, by dropping his arms to his sides while in flight he increased the risk of injury. In short, he could have greatly reduced the danger to himself with very little effort—by not running, by not diving from a height, by keeping his hands extended in front of him (as his companion had the sense to do). Of course he did not know there were subsurface rocks where he was diving, but a reasonable man would have known that the danger, though small, was great enough (considering the possible consequences) to warrant the simple precautions that would have averted catastrophe.

Davis's conduct was, therefore, not minimally negligent but willful and wanton, like that of the plaintiff in *Beverly Bank v. Penn Central Co., supra.* But it does not follow that Davis's willfulness and wantonness was three times as great as that of the government. Although the scope of judicial review of such a determination is limited, the determination is not committed entirely to the discretion of the trier of fact and we must reverse if we

have a firm conviction that it is wrong. See, e.g., *Caldwell v. Piggly-Wiggly Madison Co.,* 32 Wis.2d 447, 459, 145 N.W.2d 745, 752 (1966); *Winstead v. Hall,* 251 Miss. 800, 171 So.2d 354 (1966). It would be easy to uphold the district court's allocation of fault if the government were guilty of only minimal negligence. But since both parties were willful and wanton under Illinois law, the natural division of fault would have been 50–50; and giving all due deference to the district court's superior ability to make the comparative-negligence determination, we cannot find any basis in the district court's opinion or in the record for regarding Davis as having been more than twice as blameworthy as the government. This means that, at the most, he should bear two-thirds (not three-fourths), and the government one-third, of the cost of the accident.

We shall therefore reverse the judgment of the district court insofar as it failed to award Davis more than one-fourth of the $4,047,000 damages that the parties agree is the proper measure of his injury, and remand the case for a new trial limited to the proper apportionment of the parties' fault, unless Davis, within 21 days of the receipt of our mandate by the district court, files a written election to accept one-third of the damages. We direct the district court to enter judgment for that amount if Davis files such an election within the specified time. Otherwise there must be a new trial limited to the apportionment question. Cf. Schwartz, *supra,* at 206; *Parchia v. Parchia,* 24 Wis.2d 659, 669–70, 130 N.W.2d 205, 211 (1964).

This procedure is not foreclosed by *Dimick v. Schiedt,* 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935), which holds that the Seventh Amendment forbids additurs in federal trials unless the plaintiff consents. This rule is triply inapplicable in this case: we have made the additur conditional on the plaintiff's consent; the amount of damages is not in dispute; there is no jury trial in Federal Tort Claims Act cases. Cf. *McCoy v. Wean United, Inc.,* 67 F.R.D. 495, 500 (E.D.Tenn.1975). The

government cannot complain since we have held that Davis is entitled to a minimum of one-third of his damages as a matter of law.

■ Should there be a new trial, under our Circuit Rule 18 it will be before a different judge, even though the trial will be limited to one issue; we mention this because there has been some uncertainty as to whether the rule applies in cases of partial new trial.

Finally, there will be no award of costs in this court.

AFFIRMED IN PART AND REVERSED IN PART.

FAIRCHILD, Senior Circuit Judge, concurring in part, and dissenting in part.

I concur in the majority's rejection of the claim of the government that it is entitled to reversal and judgment in its favor.

I have serious doubt as to the majority's conclusion as a matter of law that Davis was a trespasser. There seems to be no question that the public was invited into the property for recreational purposes, including swimming at various locations. Under the FTCA it is necessary to equate the government with a private individual under like circumstances. An invitee on privately owned land would not be charged with constructive notice of the private owner's decision not to permit swimming. I doubt that Illinois would hold that an invitee becomes a trespasser by violating an ineffectively communicated restriction on an otherwise apparently acceptable use.

Similarly, I doubt whether the government's failure to give a more adequate warning can properly be held as a matter of law to be willful or wanton.

But even assuming that the majority has correctly resolved these two issues, I do not share the "firm conviction" that the 75%–25% apportionment of causal fault was wrong. I would affirm the judgment appealed from.